Evelyn DOUGLAS, Appellant,

v.

KRIEGSFELD CORPORATION,
Appellee.

No. 02–CV–711.

District of Columbia Court of Appeals.

Argued Dec. 3, 2003.
Decided May 13, 2004.

Brian Gilmore, through Neighborhood Legal Services Program, for appellant.

Timothy P. Cole for appellee.

Rhonda Dahlman and Anthony J. De-Marco filed a brief for Amicus Curiae Legal Counsel for the Elderly.

Tamara Jezic, Jonathan Smith, Eric Angel, and Julie Becker filed a brief for Amicus Curiae The Legal Aid Society of the District of Columbia.

Michael L. Murphy and David T. Beddow, Washington, filed a brief for Amicus Curiae Law Students in Court.

Before SCHWELB and RUIZ, Associate Judges, and FERREN, Senior Judge.

FERREN, Senior Judge:

This case presents the question under the federal Fair Housing Act (and related District of Columbia regulations) whether the trial court erred in denying a tenant the opportunity to defend her landlord's action for possession by claiming discrimination—more specifically, the landlord's failure to provide a "reasonable accommodation"—based on her alleged "handicap" (mental impairment). We rule for the tenant and thus reverse and remand for a new trial.

## I.

On August 23, 2001, Kriegsfeld Corporation (landlord) served Evelyn Douglas (tenant)—a beneficiary of federally subsidized "Section 8" housing who was current with her rent—with a thirty-day notice to "cure or quit" for violation of her covenant to "maintain the apartment in clean and sanitary condition." Later, at trial, the landlord presented evidence that the apartment had a foul odor emanating into the rest of the building; that the toilet was frequently filled with feces and urine; and that garbage, rotting food, and dirty laundry were strewn about. An exhibit to the tenant's earlier, unsuccessful motion for summary judgment confirmed that as a result of this situation the landlord's representative, Ms. Deborah Reid, had referred the tenant to St. Elizabeths Hospital for a psychiatric evaluation.

The tenant neither cleaned up the premises nor vacated the property, and the landlord accordingly filed an action for possession on November 30, 2001. Through counsel, the tenant filed a timely answer and asked for a jury trial. Her answer included a general denial, a challenge to the validity of the notice to cure or quit, and a defense of discrimination under the federal Fair Housing Act. She also proffered a defense and counterclaim under the D.C. Human Rights Act (not at issue on appeal).

Soon thereafter, on February 5, 2002, counsel for the tenant sent a letter to the Director of the Department of Consumer and Regulatory Affairs (DCRA) "requesting a reasonable accommodation under the Federal Fair Housing Act" for a "disability (mental)," namely a "mood disorder," that affected the tenant's ability to keep the apartment "safe and sanitary." Counsel added: The "District of Columbia Government is prepared to assist her with cleaning the apartment." DCRA never took action.

On February 20, 2002, two weeks after his letter to DCRA, counsel for the tenant wrote counsel for the landlord "requesting a reasonable accommodation in complying with provisions of [the tenant's] lease." In this letter—filed with the trial court as Exhibit 2 to the tenant's motion for summary judgment and discussed in counsel's supporting memorandum—counsel stated, more specifically:

Ms. Douglas suffers from a mood disorder (mental illness). She is on SSI disability. She has been assigned a case worker with the District of Columbia government and she is an outpatient at a city operated mental health/substance abuse clinic.

... The District of Columbia government has advised me that they are prepared to assist her with her problems because it is their opinion as well that Ms. Douglas would benefit from intervention and a reasonable accommodation.

According to counsel for the tenant's uncontradicted assertion in the trial court, landlord's counsel—who has acknowledged receipt—never responded to this letter.

Later, at a pretrial conference, the court asked for briefs on the question whether the tenant should be permitted to present her discrimination defense based on the landlord's failure to make a "reasonable accommodation" of her alleged mental disability.[1] Thereafter, the trial court denied the tenant's motion for summary judgment, and on the day set for trial, June 17, 2002, the court heard testimony and argument on the reasonable accommodation issue outside the presence of the jury. The trial court conducted this hearing primarily to find out whether the tenant's proffered "mental health experts" were qualified to testify, and whether their testimony would support a finding that the tenant's mental illness caused her to leave the apartment in an unclean, unsanitary condition—the factual predicate required for a "reasonable accommodation" defense.

After the tenant's proffered experts had testified, but before the trial court ruled, the landlord's counsel acknowledged to the court that counsel for the tenant (presumably sometime after his letter of February 20) had requested, as an accommodation, a stay of eviction that would permit an agen-

---

1. The tenant, who had been missing for several weeks before the pretrial conference, did not appear for that conference, even though counsel had tried many times to find her. Later, the tenant also failed to appear for trial, but the court permitted counsel to proceed on her behalf after he had represented to the court that her absence was due to mental illness.

cy of the D.C. government to "clean up" the apartment. The landlord's counsel further acknowledged: "I did not specifically talk to [tenant's counsel] about that until a couple of weeks ago," around the first of June 2002, "when I told him that his proposal simply lacked any specifics for us to really make an evaluation on." Landlord's counsel added his opinion that tenant's counsel "had no authority to speak for the D.C. government,"and thus could not assure that the apartment would be cleaned or, if so, how long it would stay that way. Earlier in the proceeding, landlord's counsel had stated his bottom-line position, communicated to tenant's counsel on June 14, three days before trial: "We are willing to allow Ms. Douglas to stay in the unit through the end of August, the beginning of September, but the landlord would definitely request possession of the unit after a period of time"—whether the apartment was clean or not.

The court was troubled that no one at the hearing had asked the tenant's experts, who were in a position to know, exactly "what the possibilities [were] for Adult Protective Services to do cleaning of this apartment." Whereupon counsel for the tenant proffered that the District government had a fund for paying contractors to clean apartments for the disabled, and that his expert was in a position to use this fund to help the tenant. Counsel made clear, however—and the court appeared willing to accept—that the District government would not incur the cleaning expense without assurance that the tenant could remain in her apartment as long as it stayed clean; the District would not restore the apartment merely for the landlord's benefit. Accordingly, it was clear to everyone that the tenant was seeking, as a "reasonable accommodation," a stay of eviction for a period long enough for the District government to clean the premises and thus cure the tenant's breach of the lease. Significantly, moreover, counsel for the tenant was unequivocal in conceding that if the requested delay, coupled with government intervention, "didn't work out"—meaning that if the apartment became filthy again either because the tenant (after counseling) failed to change her ways, or because the government failed to continue its cleaning services on the tenant's behalf—the landlord would have an acknowledged remedy, eviction. According to counsel, a reasonable accommodation, once given, need not be repeated if the tenant or her government protector failed to comply with its terms. In short, the tenant was asking for one brief extension of the "cure" period under the lease, and no more, based on a proffered mental illness that allegedly had caused her to foul the premises unremittingly.

The trial court, after hearing evidence and argument, saw the point clearly and questioned the landlord's bottom-line position:

[T]his case almost sounds to me like it's resolvable if the government could make assurances that would satisfy the plaintiff. I mean, I don't want to put the plaintiffs in an awkward position.... [T]hey have their right to a trial and they have waited now for several months until today's trial date as well. And I don't want to speak for them; but it sounds like they feel sorry for the defendant, too, and if they could just—if they could be assured that this place was going to be clean and not posing a danger to other tenants that they might be willing to let this go, or at least to see what happens....

[I]f the place really got cleaned up, and there was some assurance—some reasonable assurance that it was going to be maintained—these people [i.e, the landlord's representatives] don't have any—they're not out for blood. I mean,

I don't think—I don't know, the client [representative of the landlord] is nodding with me as if she agrees.

I don't have the sense that [the client representative of the landlord is] anxious to see this poor woman out on the street homeless. Everybody knows that if she gets evicted in this case, it's not going to be very easy for her to get another apartment through the Section 8 Program or otherwise.

... I'm just trying to figure out whether there is a way to resolve this case without the need to—without the need to move someone who might not have to be moved in order to satisfy both parties. And there have been these statements made that the Adult Protective Services can provide the services that the landlord presumably would think were necessary, but won't, because the case is pending. But I mean, if that's the only impediment to Adult Protective Services going in there and doing the cleaning, both initially and on an ongoing basis, presumably they could [be] disabused of the erroneous view that they shouldn't act while the case is pending. I mean, why not?

[I]f counsel for the landlord said, look, yes, the case would still be pending, we would agree to such stay for some period of time just to see how things go, but I want to tell you if the place is brought up to an acceptable condition and if you keep it there, you know, we're okay with that, why would [the District government] have a problem with that? (Emphasis added.)

... I can understand why, hypothetically, [District government representatives] don't want to send three people in there for two days and clean it up and then have the defendant evicted the next week. But if they have every reason to believe that their work would not be for naught, I would hope that they're not so tied up in bureaucratic concerns that that would make it impossible.

... I guess in some respects we would have to speculate as to whether [the tenant] would allow these folks in to clean her apartment.

To the court's final observation the tenant's counsel replied: "[I]t might take a little bit of effort, it might not take one day, it might take a whole week or two weeks or something like that."

The trial court adjourned the hearing after announcing that it would rule the next morning on the tenant's proffered defense "if we are going to trial." There was no settlement, however. The following day, the court ruled by oral opinion that the tenant could not present a "reasonable accommodation" defense. The jury then heard an essentially defenseless case and found for the landlord (the tenant subsequently was evicted). The tenant appeals from the trial court's ruling that barred her discrimination defense and from the court's order upon the jury verdict that resulted in her eviction.[2]

## II.

The trial court rejected the tenant's disability discrimination defense "for several reasons," each of which the court found "independently sufficient" for its ruling.

---

**2.** Before trial, over the tenant's objection, the court had honored the landlord's request to permit a videotaped deposition of its process server, who was moving to Texas and would be unavailable for trial on the tenant's claim of improper service of the notice to cure or quit. Although the tenant has appealed this ruling, we need not address it in light of our disposition in the tenant's favor on other grounds.

First, said the court, the tenant's "request for an accommodation"—which was "extremely vague"—came too late, several months after the landlord had served the thirty-day notice to cure or quit and filed the lawsuit. The court acknowledged that it had "equitable authority" to grant relief when a lease violation had not been eliminated during the thirty-day "cure period." But it would not exercise that authority here because of the tenant's "apparent refusal to allow people to come into the apartment to do any cleaning" and her resulting failure to cure the lease violation even before trial.

Second, the court opined, the premises were "a direct threat for the health and safety of others who live in the building." Thus, "almost" as a matter of law under the Fair Housing Act "no accommodation would be reasonable."

Third, for lack of qualified "expert testimony," the court found the tenant's evidence insufficient to demonstrate that she "had a mental disability," and that this disability "caused her not to maintain her apartment in a clean and sanitary condition." The trial court conceded that testimony from "a psychiatrist or a clinical psychologist" was not necessary; a qualified "social worker or mental health specialist" could suffice. But in the court's judgment, although each of the tenant's two witnesses was a mental health professional with the D.C. government, neither was qualified by "education or experience" to "render an opinion" on either the disability or the causation issue.

3.  42 U.S.C. §§ 3602(h), –3604(f)(1) (2000).

4.  42 U.S.C. § 3602(h)(1) and (3) (2000). Impairments attributable to "illegal use of or addiction to a controlled substance" are excluded from protection. 42 U.S.C. § 3602(h) (2000).

## III.

### A.

■ Before addressing the trial court's analysis, we believe it will be useful to outline the regulatory scheme that governs this case. First, the Federal Housing Act, as amended in 1988, prohibits a landlord from discriminating (among others) against a tenant of a dwelling because of the tenant's "handicap."[3] A "handicap" is defined to include a "mental impairment" and even applies to someone who is merely "regarded as having such an impairment," whether impaired or not.[4] "Discrimination" includes not only specified acts by a landlord that overtly deny equal treatment, but also a landlord's "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling."[5] In sum, actions based on a landlord's perception of mental impairment, not only on the reality of it, can give rise to actionable discrimination; and discrimination can be found even in a landlord's failure to offer a tenant assistance, not merely in affirmative acts of rejection.

The District of Columbia Human Rights Act employs virtually the same language as that found in the federal Fair Housing Act, substituting the word "disability" for "handicap" while incorporating verbatim the federal wording for discrimination based on "a refusal to make reasonable accommodations" for the disabled.[6] The Human Rights Act and related regulations also specify prohibited acts for which a discrimination complaint may be filed with

5.  42 U.S.C. § 3604(f)(3)(B) (2000).

6.  D.C.Code §§ 2–1402.21(a), –1402.21(d)(3)(B) (2001).

the D.C. Office of Human Rights.[7] However, neither the Act nor the regulations supply criteria or procedure for determining whether a tenant has sought, and the landlord failed to make, a "reasonable accommodation." Such a procedure is found, nonetheless, in regulations adopted pursuant to a Stipulated Agreement of September 30, 1997 between the District of Columbia and the United States Department of Justice and administered by the District's Department of Consumer and Regulatory Affairs (DCRA).[8] Under these DCRA regulations, when a tenant requests a "reasonable accommodation" (not further clarified), DCRA may grant, grant with "specified conditions," or deny the request. The DCRA Director is given forty-five days (subject to exceptions not relevant here) in which to make a "final decision" in writing, failing which "the request shall be deemed granted" as a "final decision of the District of Columbia government."[9] °

The landlord argues that these D.C. Regulations pertain only to "D.C. Government" housing, not to "private landlords." The issue thus raised is a difficult one. Some of the language of the regulations themselves arguably applies only to public housing, and indeed the federal government, by insisting that the District adopt suitable regulations, would seem to have primary interest in accommodations in federally-subsidized housing. On the other hand, the federal Fair Housing Act's "reasonable accommodation" requirement applies to private as well as public housing, and DCRA could well serve as a facilitator of reasonable accommodations by brokering a dialogue between tenant and landlord to that end. As elaborated below, however-

er, a resolution of this issue is not necessary to decision, and thus we leave the answer to another day.

Finally, both the federal Fair Housing Act and the D.C. Human Rights Act also contain an important limitation. Neither "requires that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others."[10]

Although the D.C. Human Rights Act virtually tracks the federal Fair Housing Act insofar as the "reasonable accommodation" requirement is concerned, the tenant has proceeded on appeal exclusively under the federal statute, perhaps because the available legal authority is federal case law. We note, however, the virtual congruence of the local and federal statutes in the respect at issue.

**B.**

■ We turn, then, to the trial court's first ruling: that the discrimination defense is barred because the tenant's "extremely vague" request for a reasonable accommodation—presented months after the landlord had served the notice to cure or quit and filed suit—came too late. The trial court is wrong here. In the first place, the tenant's requested accommodation—a brief stay of eviction to permit the District government to clean the apartment, as it had reportedly agreed to do, was not "extremely vague." The landlord's representative testified that he understood what was wanted, and the trial court's comments at the end of the hearing before trial revealed that the court was

---

7. D.C.Code § 2–1403.04 (2001); 4 DCMR §§ 1001.1(a), –1001.7 (1999).

8. 45 D.C.Reg. 8057 (1998); 14 DCMR § 14–111 (1998).

9. 14 DCMR §§ 111.3, –111.4,111.9, 111.6, –111.11 to 13 (1998).

10. 42 U.S.C. § 3604(f)(9) (2000); D.C.Code § 2–1402.21(d)(5) (2001).

clear about it as well. Furthermore, counsel for the tenant had requested a "reasonable accommodation" by letter of February 20, 2002, which the landlord's counsel declined to answer. At some point thereafter the landlord's counsel learned, more specifically, what accommodation the tenant was seeking: a brief stay of eviction. But landlord's counsel acknowledged at the hearing that his client had been unwilling to engage in discussions with the tenant's representative until early June 2002—discussions which at any time after February 20 presumably could have brought whatever additional precision to the request was necessary for the landlord to evaluate the tenant's position. Under all the circumstances, therefore, we can perceive no vagueness, let alone vagueness attributable to the tenant, and the trial court clearly erred in finding otherwise.

■ Next, as to the timing issue itself, under the Fair Housing Act unlawful discrimination occurs whenever "a dwelling is 'denied' to a renter because of that renter's handicap."[11] Under federal case law interpreting that provision, a denial is deemed to occur during the entire period before a tenant is "actually evicted," not merely during the shorter cure period specified in the notice to cure or quit.[12] A "reasonable accommodation" defense, therefore, is available at trial, before a judgment of possession has been entered, if the other requirements of the defense are met.

To support its ruling that the tenant's request for accommodation had come too late, the trial court relied on our *Grubb* decision[13] for equitable authority to deny

the tenant relief. *Grubb,* however, was a local law decision addressing a notice to cure or quit unaffected by a Fair Housing Act defense. It has no application to the timing issue under federal law. Furthermore, *Grubb* itself noted that a "relevant factor in determining whether forfeiture [of a lease] should be ordered is the presence or absence of 'fair dealing' by the landlord."[14] That landlord factor was not considered when the trial court relied on *Grubb* to deny the tenant's discrimination defense on grounds of timing. More specifically, the trial court ignored the fact that between February 20 and early June 2002—a period longer than three months—the landlord's counsel refused to respond to the tenant's counsel. (Accordingly, our colleague's complaint, *post* at 974, that the tenant's apartment remained filthy "for a protracted period and after a suit for possession had been instituted" cannot be deemed the fault of a tenant whose counsel was trying, proactively, to take curative steps that the landlord was ignoring.) Absent a vagueness or a timing issue, therefore, the question remains: was the tenant entitled on the facts of record to defend on the landlord's refusal to make a "reasonable accommodation"?

### C.

■ The court said "no" for a second reason: that this case came within the statutory exception that cancels a landlord's obligation to offer a reasonable accommodation when the tenancy constitutes "a direct threat to the health or safety of other individuals."[15] Contrary to the trial

---

11. *Radecki v. Joura,* 114 F.3d 115, 116 (8th Cir.1997) (citing 42 U.S.C § 3604(f)(1)(A) (2000)).

12. *Id.*

13. *Grubb v. Wm. Calomiris Inv. Corp.,* 588 A.2d 1144 (D.C.1991).

14. *Id.* at 1146.

15. 42 U.S.C. § 3604(f)(9) (2000); D.C.Code § 2–1402.21(d)(5) (2001).

court's understanding, however, federal courts construing the Fair Housing Act have held—and we agree—that this exception does not come into play until *after* an effort for accommodation has been made and the court has determined, through a probing factual inquiry, that no reasonable accommodation could ameliorate the situation sufficiently to protect the health, safety, and property of others.[16] As one court has succinctly put it, "accommodation of an individual's handicap must be attempted before denial of the benefits of federal legislation."[17] Here, however, the landlord never attempted an accommodation, and yet the trial court held—"almost" as a matter of law—that the requested accommodation, even if attempted, could not save the situation for the tenant and others in the building. With all respect, we believe that in denying the very possibility of an effective accommodation, the trial court ruled prematurely that the "health and safety" exception barred the tenant's defense.

We would agree that, unless the requested accommodation gave adequate assurance that the apartment would be cleaned up promptly—and offered a reasonable prospect for its staying clean—the health and safety exception would likely justify the tenant's eviction. In this case, however, the trial court did not give "accommodation" the required try—a curious decision in light of the court's own clear recognition, at the end of the hearing before trial, that the government's willingness to keep the premises clean would be a complete answer to the landlord's concerns. So what turned the trial court around?

The court was influenced by its perception of the tenant's "apparent" refusal to allow others to help with the cleaning—a perception influenced, perhaps, by the fact that the tenant had been eluding counsel and had not shown up for trial.[18] As a result of this perception, in applying the "health and safety" exception, the court concluded "almost" as a matter of law that accommodation would not work. The court's hedging language—not raised to the level of a concrete finding of fact—theoretically left room for further inquiry into accommodation, especially because (as we shall see below) the tenant was a subject of ongoing Adult Protective Services (APS) intervention, in addition to being the client of an attentive lawyer. Furthermore, the court itself acknowledged that "we would have to *speculate* as to whether [the tenant] would allow these folks in to clean her apartment" (emphasis added)—hardly a finding that she would not do so. Finally, after the pretrial hearing, the court never questioned counsel's proffer that the District government would clean the apartment if the court granted the requested stay. And yet the court did not go further. In its ruling, the court concluded to a virtual certainty that no reasonable accommodation was realistically available. In doing so, the court did not understand how thoroughly a tenant's request for accommodation must be explored—first by the landlord, then by the court—before a forfeiture order is lawful.

■ Once a tenant requests a "reasonable accommodation" for a handicap, such as mental impairment, federal law obliges the landlord to "open a dialogue" with the tenant, eliciting more information as need-

---

16. *Roe v. Sugar River Mills Assocs., MB Mgmt. Corp.*, 820 F.Supp. 636, 639–640 (1993).

17. *Roe v. Housing Auth. of the City of Boulder*, 909 F.Supp. 814, 822 (1995).

18. See *supra* note 1.

ed, to determine whether the requested accommodation is feasible and offers a reasonable possibility of curing the lease violation.[19] In this case, for example, the tenant sought a brief stay of eviction to allow an agency of the D.C. government, APS, to clean the premises. According to the tenant's proffer, APS had agreed to do so if (but only if) the eviction was put off and the cleaning assuredly would benefit the tenant, not just the landlord. Presumably, too, the stay was to have remained in effect as long as the tenant was keeping the premises clean, either because counseling channeled her behavior toward a reasonably sanitary pattern of housekeeping or, more likely in this case, because the District government continued to clean for her as it was accustomed to doing for the disabled. If these efforts were successful, the law would allow the tenant to stay in her apartment. But if the efforts failed—as tenant's counsel himself conceded—the tenant could not forestall eviction any longer, given the statutory "health and safety" exception under discussion.

■ Here, then, is the point: until a landlord makes a good faith, reasonable effort at accommodation, upon request, after learning of a tenant's mental impairment, the landlord's continued pursuit of a pending action for possession is a discriminatory act under the Fair Housing Act and the D.C. regulations that implement it. In this case, however, despite the trial court's own common-sense observation that the landlord would be completely protected if it agreed to a brief stay (extending the "cure" period) while the District govern-

ment cleaned the premises, the court never connected that observation with its analysis of the Fair Housing Act. That is, the court never perceived the full meaning of the "reasonable accommodation" requirement. It failed to recognize that, before the "health and safety" exception could be invoked, the landlord had a legal duty to "open a dialogue" with counsel for a mentally impaired tenant, not merely a practical responsibility to pursue a settlement for the parties' mutual benefit. Accordingly, as a consequence of its incorrect belief that the "health and safety" exception could be invoked without concrete findings on the "dialogue" issue, or even on the "tenant cooperation" issue—findings which the trial court never made—the court's reliance on that exception to justify the eviction was premature and thus a clear error of law.

■ Our dissenting colleague rejoins by saying that the "reasonable accommodation" defense, as formulated by the tenant, is unavailable as a matter of law because it does not fit the traditional understanding of "accommodation." Several federal courts, he notes, have said: " 'Reasonable accommodation' means changing some rule that is generally applicable to everyone so as to make its burden less onerous on the handicapped individual." [20] The Fair Housing Act itself, however, defines discrimination more broadly as "a refusal to make reasonable accommodations" not only in "rules" but also in "policies, practices, or services," [21] language broad enough to embrace an extraordinary variety of landlord actions that surely covers a

---

**19.** *Jankowski Lee & Assocs. v. Cisneros,* 91 F.3d 891, 895 (7th Cir.1996).

**20.** *Oxford House, Inc. v. Township of Cherry Hill,* 799 F.Supp. 450, 462 n. 25 (D.N.J.1992); accord *Bangerter v. Orem City Corp.,* 46 F.3d 1491, 1501–02 (10th Cir.1995); *Keys Youth Servs. v. City of Olathe,* 38 F.Supp.2d 914, 924

(D.Kan.1999); *Alliance for The Mentally Ill v. City of Naperville,* 923 F.Supp. 1057, 1078 (N.D.Ill.1996); *N. Shore–Chicago Rehab., Inc. v. Vill. Of Skokie,* 827 F.Supp. 497, 499 (N.D.Ill.1993).

**21.** *Supra* note 5; *see Alliance for Mentally Ill,* 923 F.Supp. at 1078.

brief extension of the "cure or quit" period at issue here. Such extension after a tenant violates a lease covenant may not be the kind of accommodation requested—and required—for most handicaps. But the Fair Housing Act requires reasonable accommodation of "mental illness,". which, unlike many handicaps, inherently reflects varied, unusual behaviors that will require unique responses—limited, of course, to reasonable ones—if the statutory purpose of "accommodation" is to be effectuated. Here, in any event, the tenant asks for waiver of a "generally applicable" rule/policy/practice, namely "relaxation or bending"of the rigid "cure or quit" timetable in a standard apartment lease, in order to make the cure period (in our dissenting colleague's words) "less onerous for the person claiming to be handicapped." [22] In our view, this request by the tenant meets the statutory test for "reasonable accommodation."

It is interesting to note, moreover, that the tenant's requested accommodation would be considerably less burdensome on the landlord and the other tenants than the typical accommodation recognized in the case law—for example, allowance of pets and priority parking, contrary to the landlord's standard lease/rule/policy. Here, the tenant seeks only a brief stay of eviction, not the typically requested "relaxation or bending" of a rule for the entire term of the tenant's lease. Contrary to the scene our colleague paints, the tenant seeks only time to clean the apartment—to cure the lease violation—not the right to keep the apartment filthy to the detriment of others.

## D.

■ We turn, finally to the merits of the tenant's discrimination defense. Everyone agrees that, in cases such as this where there is no direct evidence of discrimination, the court must employ the burden-shifting approach outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (interpreting Title VII of the Civil Rights Act of 1964).[23] Under this approach, as adapted to the reasonable accommodation issue under the Fair Housing Act, the tenant must first establish a prima facie case of discrimination by demonstrating that (1) she suffered from a "handicap" (or "disability"), (2) the landlord knew or should have known of the disability, (3) an accommodation of the disability was necessary to permit the tenant's use and enjoyment of her apartment, and (4) the landlord refused to grant a reasonable accommodation.[24] Once a prima facie case is established, the burden shifts to the landlord to "articulate some legitimate, nondiscriminatory reason" for seeking eviction.[25] If the landlord makes that showing, the burden then shifts back to the tenant to demonstrate that the landlord's reason was a pretext for discrimination.[26] At all times, however, the ultimate burden of persuasion as to discrimination remains with the tenant.[27]

22. *Post* at [985].

23. *Neithamer v. Brenneman Prop. Servs., Inc.*, 81 F.Supp.2d 1, 3–4 (D.D.C.1999) (Fair Housing Act); *see American Univ. v. D.C. Comm'n on Human Rights*, 598 A.2d 416, 422 (D.C. 1991) (applying "reasonable accommodation" requirement of D.C. Human Rights Act to alleged employment discrimination).

24. *United States v. Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1380 (9th Cir.1997); *Means v. City of Dayton*, 111 F.Supp.2d 969, 977 (S.D.Ohio 2000); *In re Kenna Homes Coop. Corp.*, 210 W.Va. 380, 557 S.E.2d 787, 794 (2001).

25. *Neithamer*, 81 F.Supp.2d at 4; *accord American Univ.*, 598 A.2d at 422.

26. *Id.*

27. *Id.*

We recall first—although the trial court did not address the point—that in response to D.C. regulations, the tenant filed a request for a "reasonable accommodation" with DCRA. Counsel's letter stated that the tenant needed an accommodation for a "disability (mental)," specifically a "mood disorder," affecting her ability to keep her apartment "safe and sanitary," and that the "District of Columbia Government [was] prepared to assist her with cleaning the apartment." DCRA failed to respond within forty-five days and thus, argues the tenant, should be deemed to have granted the request on behalf of the District of Columbia government.[28] Assuming, solely for the sake of argument, that these D.C. regulations apply here, and that the tenant's request was sufficiently detailed to trigger DCRA's obligation to respond, we need not consider the implications of DCRA's failure to do so. No one questions the propriety of resolving the matter in Superior Court without participation by DCRA. Furthermore, no one disputes that the tenant has, as much as possible, exhausted any applicable administrative remedy. Finally, as we shall explain below, the tenant prevails on the merits without need to rely on DCRA. Accordingly, we need not resolve the DCRA issue—including the applicability of the cited regulations—that the tenant posits.

▪ Now to the facts. Contrary to the trial court, we conclude that the tenant established a prima facie case satisfying the four McDonnell–Douglas criteria. As to the first of these—a required showing that the tenant suffered from a "handicap" (or "disability")—the court concluded that the quality of the testimony establishing the tenant's mental impairment and its effect on the maintenance of her apartment was deficient, because the witnesses were not sufficiently expert to opine on the subject. Eschewing the need for a psychiatrist or psychologist, the trial court observed that a "social worker or mental health specialist" could supply the requisite expert testimony. In acknowledging that possibility, moreover, the court was aware that the tenant's witnesses, James Sutton and Damon Byrd, were employed full time as mental health professionals by the District of Columbia government. Sutton, who had a masters degree in "mental health," had been a supervisor with the District's Emergency Psychiatric Response Division for sixteen years, with personal experience making psychiatric assessments and ordering involuntary civil commitments. Byrd had been a social worker with the District's Adult Protective Services Unit for three years, with experience investigating abused, neglected, self-neglected, and disabled adults. Both had daily, on-the-job experience with diagnosing persons as mentally ill, and each had had multiple encounters with the tenant, whom Byrd had visited sixteen times. In court, Sutton and Byrd each testified that, in his opinion, the tenant was mentally ill, and that this illness, exacerbated by heavy dependence on alcohol, substantially limited her ability to care for her apartment.[29]

**28.** *Supra* note 9.

**29.** Alcohol abuse, like mental impairment, is a "handicap" that can serve as the basis for a discrimination claim under the Fair Housing Act, 42 U.S.C. § 3602(h)(1)-(3) (2000); 100 H.R. Rep. 711, 2d. Sess. 22 (1988) (making clear Congress's intent that the Fair Housing Act's definition of "handicap" be interpreted and regulated consistently with the same term in the Rehabilitation Act of 1973); *United States v. Southern Mgmt. Corp.*, 955 F.2d 914 (4th Cir.1992). Accordingly, someone with an alcohol problem, like a mentally impaired individual, must be afforded a reasonable ac-

The trial court refused, nonetheless, to grant any credence to these appraisals. We believe that the court's ruling, on this particular record, was "manifestly erroneous." [30]

It is not entirely clear whether the court was saying that individuals with Sutton's and Byrd's training and experience were not qualified to opine on "mental impairment" under the Fair Housing Act, or was saying merely that the two witnesses, while perhaps generally qualified for this purpose, did not impress the court enough to justify crediting their testimony in this particular case. A careful reading of the trial court opinion, however, conveys the strong impression that the court was saying the former, because it persisted in noting that these witnesses were unqualified to offer opinions as to the tenant's particular "diagnosis," including analysis of specific symptoms of the "mood disorder" ascribed to the tenant in the report of a St. Elizabeth's Hospital psychiatrist who had assessed her.

■ In our opinion, the court's requirement of expert testimony to explain a particular diagnosis of mental illness sets the bar too high for establishing the existence of "mental impairment" under the Fair Housing Act. "Mental impairment" is a generic term that incorporates multiple

diagnoses and, on occasion, is susceptible to identification by lay individuals even less trained and experienced than Sutton and Byrd. Indeed, persuasive case law firmly establishes that lay persons—while not competent to offer specific diagnoses— can be qualified to testify generally as to whether a person is suffering from mental illness.[31] No more than that—no specific diagnosis—is required for a finding of mental impairment under the Fair Housing Act.[32]

■ Nor, in this particular case, is much expertise required to show that the tenant's mental impairment, combined with alcohol abuse, was a contributing cause of the unsanitary condition of her apartment. We agree with the trial court that, in general, "[t]here are plenty of people who have mental disabilities who can keep their apartments clean," and that "there are plenty of people who don't have mental disabilities who don't keep their apartments clean." But, on this record, it is not readily apparent what explanation there might be—other than mental illness and alcohol abuse—for the tenant's filthy apartment.

■ It is important to note that under the Fair Housing Act, in a provision common to antidiscrimination statutes,[33] a ten-

commodation pursuant to the Fair Housing Act. *Samaritan Inns v. District of Columbia,* 11 Am. Disabilities Dec. 1166 (D.D.C.1995), *aff'd in relevant part,* 114 F.3d 1227, 325 U.S.App. D.C. 19 (1997); *Walker v. Weinberger,* 600 F.Supp. 757 (D.D.C.1985); *Robinson v. Devine,* 37 Fair Empl. Prac. Cas. (BNA) 728 (1985).

**30.** *In re Melton,* 597 A.2d 892, 897 (D.C.1991) (en banc).

**31.** *E.g., Conn. Mut. Life Ins. Co. v. Lathrop,* 111 U.S. 612, 4 S.Ct. 533, 28 L.Ed. 536 (1884); *Dodrill v. Shalala,* 12 F.3d 915, 919 (9th Cir.1993); *deBruin v. deBruin,* 195 F.2d 763, 764 (D.C.Cir.1952).

**32.** 42 U.S.C. § 3602(h) (2000); *cf. Advocacy Ctr. for Persons with Disabilities, Inc. v. Woodlands Estates Ass'n Inc.,* 192 F.Supp.2d 1344, 1347 (M.D.Fla.2002) (plaintiffs need not show "exact disabilities" to demonstrate they are "developmentally disabled" and thus entitled to "reasonable accommodation" as handicapped persons under Fair Housing Act).

**33.** *E.g.,* Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101, 12102 (2000); Rehabilitation Act of 1973, 29 U.S.C. §§ 701, 705 (2000); District of Columbia Human Rights Act, D.C.Code § 2–1401 (2001).

ant suffers a "handicap," for purposes of establishing a prima facie case, if the landlord merely perceives or regards the tenant as having a handicap—whether she has one in fact or not—and then discriminates (including refusal to make a reasonable accommodation) solely on the basis of that unconfirmed perception. *Neithamer*, 81 F.Supp.2d at 4–5 (citing Fair Housing Act, 42 U.S.C. § 3602(h)(3); see *supra* note 4 and accompanying text). This emphasis on the landlord's perception of mental illness, for example, rather than on the established reality of it, is further (albeit indirect) evidence of a legislative policy that proof of a diagnosed subset of mental illness is not required before a landlord can be found to have discriminated on the basis of such handicap. In this case, counsel for the tenant proffered expert testimony that his client was mentally ill, rather than simply relying on the landlord's mere perception of the tenant's illness (*e.g.*, through Ms. Reid's referral of the tenant to St. Elizabeths Hospital) to satisfy the first requirement of a prima facie case. This reliance on the evidence that Messrs. Sutton's and Byrd's observations could provide, therefore, should not be seen as diminishing, rather than establishing, the tenant's claimed impairment.

The tenant's expert mental health specialist, James Sutton, testified that the Department of Mental Health's Comprehensive Psychiatric Emergency Services (CPES) had wanted to "bring [the tenant] in involuntarily" for civil commitment but did not have sufficient proof "that she was in imminent danger to herself or others." Sutton noted that the tenant "didn't see anything wrong" with her apartment, insisted that "she didn't have a mental health problem," and "was waiting for money to be coming from the Navy." In Sutton's opinion the tenant "was suffering from some paranoia and some delusions." He added that he had referred her to a

CPES psychiatrist, who had reported that she "was alcohol dependen[t] and that she suffered from mood disorder, NOS." Sutton described his understanding of a mood disorder but could not explain the term "NOS" (not otherwise specified). In light of all the foregoing, Sutton had tried to impress on the tenant the urgency of cleaning her apartment, and had told her that in any event "she would have to appear in court." To which she had replied: "Jesus is going to take care of it." Sutton was convinced, accordingly, that there was "a relationship between" the tenant's "mental illness" and "alcohol" abuse and the "deplorable" state of her apartment.

The tenant's other expert, Damon Byrd, the social worker with Adult Protective Services, described the tenant's appearance on one occasion as "half naked" and "completely exposed," with "heavy makeup" that was "caked up and smeared on her face." Byrd added that the tenant "was in delusional or paranoia behavior" while claiming that "she was in the Navy" and "waiting to receive her money." He testified that her "insight and judgment" were "poor," and that "[s]he did not completely understand the hazards of the apartment situation." In answer to a direct question from the court, Byrd replied, "Do I think she has a mental illness, yes," adverting to his observations of her "erratic behaviors on numerous occasions" and a diagnosis of her "mood disorder" by Dr. Henerian of the Comprehensive Psychiatric Emergency team. The court then asked Byrd: "Is a failure to maintain an apartment or other living space in a clean and sanitary way ... a typical symptom of mood disorder or is it just an example of a failure or inability to exercise good judgment"? Byrd replied:

Actually, the connection lies pretty much, in my opinion, with the alcohol. Half the time she's not sober. So if she

spends half her time drinking, she's not able to effectively clean her apartment, notwithstanding the fact that the apartment is rodent and rat infested. That doesn't help the situation. So I would say, a combination of—I believe that the alcoholism impacts her diagnosis of mood disorder. . . .

The trial court rejected Sutton as an expert witness, despite his training and experience, because of the court's perception that Sutton had relied "heavily" on the psychiatrist's diagnosis of the tenant's "mood disorder," without an accompanying psychiatric opinion on "any connection" between that particular disorder and "the condition of her apartment." The court was particularly influenced by Sutton's inability to explain the "NOS" part of the "mood disorder" diagnosis. As to Byrd, the court observed:

> Mr. Byrd was readily convinced, *as I suspect all of us would be,* that there was some mental illness that he was dealing with, but he himself testified that he's not able to render a *specific diagnosis,* that he's not qualified to make mental health diagnosis." (Emphasis added.)

In sum, the court disqualified both Sutton and Byrd as experts because, although they could perceive the tenant's mental illness in general—as the court itself apparently could, too, from the testimony presented—they could not "render a specific diagnosis" and as a consequence, in the court's view, could not sufficiently show the connection between the tenant's illness and her filthy apartment.

The trial court relied for its expert testimony analysis on our decision in *American University v. Commission on Human Rights,*[34] an employment discrimination case we find inapposite here. In *American University,* we reversed a decision of the D.C. Commission on Human Rights, applying the Human Rights Act, in which the Commission had found discrimination in firing an employee without making a reasonable accommodation for her manic depression. We saw nothing in the record to show that the employee's job deficiencies were related to her handicap, or that a reasonable accommodation was possible. In the first place, no expert testimony was "offered to prove that complainant's disablement prevented her from performing the job,"[35] whereas in this case witnesses Sutton and Byrd testified that there was a causal relationship between the tenant's mental illness (exacerbated by alcohol abuse) and the deterioration of her apartment. Furthermore, in *American University,* the complainant acknowledged that medication "allowed her to behave in a 'normal' way,"[36] effectively obviating any need for an accommodation by her employer, whereas in this case the tenant's apartment living could not be normal without intervention. Finally, in *American University,* the employee herself denied any relationship between her illness and her job performance, in contrast with the case proffered here on the tenant's behalf (despite her own reported denials).

Accordingly, unlike the record we reviewed in *American University,* there appears to be "competent evidence" of record in this case—enough for a jury to consider—tending to show the tenant's "mental impairment," as defined under the Fair Housing Act, as well as its causal relationship to the unsanitary conditions of her apartment. As we have explained earlier, an ability to make a "specific diagnosis" is

---

**34.** *American Univ. v. Comm'n on Human Rights,* 598 A.2d 416 (D.C.1991).

**35.** *Id.* at 423.

**36.** *Id.*

not required of an expert qualified to testify for this purpose.

As to the second requirement of a prima facie case, the evidence—as we have seen—tended to show that the landlord knew or had reason to know that the tenant suffered from a mental impairment. The letter of February 20, 2002 from tenant's counsel informed the landlord's counsel that the tenant "suffer[ed] from a mood disorder (mental illness)," was "on SSI disability," and was "an outpatient at a city operated mental health/substance abuse clinic." Earlier, in fact, the landlord's own agent, Deborah Reid, after inspecting the apartment several times, had urged the tenant to seek help from St. Elizabeths Hospital, whereupon she did so and received the psychiatrist's diagnosis of "mood disorder" referred to above. The second requirement accordingly is met.

As to the third requirement, the evidence tended to show that the landlord knew or had reason to know that some kind of accommodation of the tenant's handicap would have to be made for her to continue living in the apartment without threatening the health and safety of others. Implicit in this requirement is an understanding that the handicap has caused the need for accommodation and that the accommodation requested would eliminate the problem. We have seen in our discussion of the first required showing—that the tenant suffered from a "handicap" (or "disability")—that the tenant's mental illness was a contributing cause of the filthy apartment. Moreover, there was no question in the landlord's—or the court's—mind what was desired: a stay of eviction for the period reasonably required for the D.C. government to clean up the apartment and, implicitly, to test whether the tenant—by herself or, more likely, with the help of the D.C. government—would keep it clean. Finally, no one disputes that a clean apartment would cure the tenant's default. The third requirement of a prima facie case is met here.

As to the fourth and final requirement, no one disputes that the landlord declined to grant the requested accommodation—a brief stay of the eviction to allow the apartment to be cleaned and thereby "cure" the lease violation—which even the trial court itself, as quoted above, found reasonable. Indeed, the landlord ignored the tenant's counsel's request for over three months, from February 20 until the beginning of June, when the landlord obtained new counsel who, for the first time, was willing to commence a dialogue on the matter two weeks before trial. Even new counsel, however, rejected the proposed stay.

The evidence before the trial court, therefore, was enough for a reasonable trier of fact to find that the tenant had proved a prima facie case of discrimination under the Fair Housing Act, thereby shifting to the landlord the burden of articulating a legitimate, nondiscriminatory reason for persisting with the eviction. The trial court, however, never imposed that burden on the landlord and thus erred as a matter of law in failing to do so.

## IV.

The jury found for the landlord and the tenant was evicted—without benefit of a discrimination defense based on the landlord's failure to make a reasonable accommodation responsive to the tenant's alleged mental impairment. The tenant asks this court to reinstate her discrimination defense and remand for a new trial. She does not specify whether, if she prevails, she should be entitled to reinstatement in the premises or—in light of the fact that the eviction was not stayed—she would be limited to recovery of damages.

We do not address that question of ultimate remedy, which may or may not become an issue. But we do agree with the tenant that the trial court erred in its rulings, and that this case must be remanded for a new trial in which she may present her discrimination defense to the jury.

## RESPONSE TO DISSENT

Our dissenting colleague's overriding concern appears to be how long it took to get the tenant out of the apartment. Given the law applicable to landlord-tenant relationships, however—including the Fair Housing Act—he assuredly is overreacting. The tenant was under lease without incident for six months (January–July 2001). Then in July the landlord, upon observing filthy, unsanitary conditions in the tenant's apartment, gave her a notice to cure or quit (August–October 2001). After she defaulted, the landlord filed suit for possession, and the tenant—for the first time represented by counsel—filed her answer requesting a "reasonable accommodation" under the Fair Housing Act (November 2001–January 2002). At this point, all the elapsed time was attributable to the normal requirements of judicial process that landlords risk having to accept from the business they have chosen to pursue.

Within a month, in February 2002, tenant's counsel wrote the landlord's counsel that accommodation was required, in particular, for "mental illness"—a condition that the landlord's agent, Ms. Reid, had perceived at least two months earlier in December 2001, when she successfully referred the tenant to St. Elizabeths Hospital. That letter was brought to the trial court's attention as Exhibit 2 to the tenant's motion for summary judgment, referred to in counsel's accompanying memorandum, and adverted to again in the pretrial court hearing. We agree that, in the interest of expediting the proceedings, counsel's requested "accommodation" should have been stated more specifically in his letter of February 20. On the other hand, as we have elaborated at length, the tenant's invocation of the "reasonable accommodation" defense triggered a corresponding legal duty of the landlord to "open a dialogue" on the issue, which the letter of February 20 expressly invited and the landlord ignored for more than three months until June, just before trial. Long before June, moreover, landlord's counsel either was aware—or could easily have become aware by asking, as the law required of him—that the tenant was seeking only a stay, not withdrawal, of the eviction action. And the requested stay would remain in effect only for the period required to clean the apartment and keep it clean (with the D.C. government's help), failing which the tenant, as her counsel conceded, would have to surrender the premises.

Contrary to the dissent, *post* at 992–94, the tenant has never claimed that the landlord lacks a right to judicial redress; the claim is that the tenant's statutory right to a "reasonable accommodation" warrants a stay of eviction pending resolution of that defense, hardly a remarkable proposition. We do not dispute our colleague's basic contention that a landlord—if acting in good faith—is not obliged to yield to a tenant's request for a reasonable accommodation until a judge rules. *See post* at 991–92 and note 32 That general proposition, however, does not advance the dissent here. In the first place, because the landlord refused to open a dialogue with counsel for a tenant whom the landlord's own representative, Ms. Reid, perceived to be mentally ill, the landlord's belief that the tenant had no grounds for accommodation was open to question. But even more

to the point, in deferring a dialogue with the tenant that might have led to resolution before a judge could hear the case, the landlord assumed the risk of being wrong about what the law requires and therefore must assume responsibility for the time that elapsed between the tenant's request for accommodation and the court's eventual ruling.

Our colleague's observation that "the judge had nothing before him from the District to confirm that any cleaning would be done," *post* at 988, misses the point. Tenant's counsel proffered in good faith an agreement with the District government. The requested stay, as counsel envisioned it, would have given him no more than a week or two to fulfill that proffer; otherwise, the stay would have been lifted and the eviction accomplished. It is no answer to say that the District had "made no effort to clean the apartment" to date. *Post* at 989. The limited stay order would have provided an urgent pressure on the government that had not existed before. Furthermore, even the court appeared to understand that, with good reason, the District would not have agreed to help unless its cleaning crew assuredly would benefit the tenant, not just the landlord, via settlement or court order.

All of which brings us to our dissenting colleague's further observation that the tenant was not available to consider a settlement—a situation, he says, that effectively mooted any possibility of accommodation. *Post* at 972 n. 2, 973–74, 978–79, 987 n. 26. That observation is nearsighted, however, since no "accommodation"— no proposal by the landlord that would allow the tenant to remain in the apartment—was ever on the table. At no time—even when landlord's counsel belatedly offered a settlement three days before trial allowing the tenant to stay on through August—would the landlord have

tolerated her remaining in the apartment thereafter, even if it were clean and remained so. Thus, any concern about the availability of the tenant (beyond the presence of her legal representative) was premature. Just as tenant's counsel, under the proposed stay of eviction, had an obligation to assure that the District government cleaned the apartment and, if necessary, helped the tenant keep it clean if she were to remain there, counsel also had a responsibility to ensure her understanding, acceptance, and support of the terms of a court-ordered stay. The court could have conditioned the stay on such follow-through by counsel. Accordingly, if the tenant and the District had cooperated with counsel's proposal, she could have remained in a clean apartment to the landlord's benefit as well as her own. If, on the other hand, her prospects for success were "a complete mirage" and she had failed to cooperate, as our colleague says would have happened, *post* at 986, she would have been out. Under the tenant's proposal, therefore, the landlord, as the court itself recognized, could not lose. And the matter could have been resolved rather quickly.

The dissent "would not include in the appellate calculus the substance of settlement proposals discussed by the court and counsel" on the record. *Post* at 987 n. 26 We cannot agree. That discussion confirms that the court understood the tenant's request for a limited accommodation and perceived it to be reasonable as a matter of objective fact, even though (as the trial court later ruled) such accommodation was not required by law.

█ We agree with our colleague that the "question whether an accommodation is reasonable 'is highly fact-specific, and determined on a case-by-case basis by balancing the cost" ' to the landlord and other affected parties and " 'the benefit" ' to the tenant. *Post* at 990. As we have shown,

however, the cost to the landlord and other tenants of the limited stay, as proposed, would be minimal—indeed, if the accommodation were successful the apartment would be cleaned and remain clean, whereas if it failed the tenant would be evicted. Compared to that cost, best characterized as inconvenience, the benefit to the tenant from the accommodation would be enormous if the court's terms could be satisfied.

In sum, any delay prejudicial to the landlord between February 2002, when a "reasonable accommodation" for "mental illness" was requested, and June 2002, when the case went to trial, was the fault primarily of the landlord. A cleanup of the apartment could have been accomplished much earlier if the landlord had been willing—as we believe the law required—to test counsel's proffered accommodation and warrant continuation of the tenancy as long as the apartment remained clean. Had the landlord done so, the apartment would have been cleaned with dispatch, either by the government or, in case of default, by the landlord itself reinstated in the premises. For all the foregoing reasons, therefore, we cannot, nor should our dissenting colleague, fault the tenant for a "protracted period" of unsanitary conditions. *Post* at 974.

The dissent, of course, questions the very availability of the "reasonable accommodation" defense here. Our colleague asserts that the requested accommodation was vague and untimely (we have explained why neither charge is true). He also argues that the "health and safety" exception to the "reasonable accommodation" defense applies here (we have elaborated, to the contrary, that under federal case law this exception does not come into play until after a reasonable accommodation has been attempted and failed). Next, he claims that the requested accommoda-

tion would not—as he says the law requires—relax a "generally applicable rule," *post* at 972 (although he does not dispute that the "cure or quit period" at issue here appears in a standard, and thus "generally applicable," apartment lease). In any event, as we have seen, the statute requires accommodation with respect not only to "rules" but also to a landlord's "policies, practices, or services." This language is broad enough, as we have explained at length, to require a landlord, in seeking to enforce a covenant to maintain the premises in a clean and sanitary condition, to grant a brief stay of eviction of a mentally ill tenant in order to allow her apartment to be cleaned and thus save her housing.

Finally, the dissent complains that under this court's standard of review, we should honor the trial court's rejection of the tenant's expert testimony by Messrs. Sutton and Byrd, and thus sustain the court's ruling that the tenant had not proved her alleged handicap, mental illness. Normally, of course, we would defer to the trial court's evaluation of proffered expert witnesses, but, as we have explained, the trial court, committing an error of law, imposed too high a standard of expertise. Despite acknowledging that training as a "psychiatrist" or "clinical psychologist" was not necessary, the court required qualification to testify as to a specific psychiatric diagnosis, "mood disorder NOS," rather than to the more general condition, "mental illness," which the Fair Housing Act allows, and which Messrs. Sutton and Byrd, the landlord's own representative (Ms. Reid), and even the trial court itself perceived in the tenant. Indeed, given Ms. Reid's observations of the tenant, when coupled with the correct level of proof of mental illness required under the Fair Housing Act, there can be no credence given to our dissenting colleague's statement that the landlord and

its attorney "could reasonably believe" that the tenant "was not suffering from a handicap within the meaning of the Act." *Post* at 991. It is no stretch, moreover, given Sutton's and Byrd's testimony on causation, to find sufficient evidence in the trial court record—surely enough for a jury to consider—showing a causal relationship between the tenant's mental illness (especially when coupled with her alcohol abuse, another handicap under the Fair Housing Act) and her propensity to maintain a filthy, unsanitary apartment. The jury was not limited to finding that the filth had been caused by a tenant best characterized as a mere "eccentric" (our colleague's word). *Post* at 982.

Accordingly, the dissent becomes irrelevant in claiming that Sutton and Byrd "acknowledged or demonstrated their lack of qualifications to opine on the issue." *Post* at 972. They did indeed lack qualifications to opine on the specifics of "mood disorder NOS," but as we have explained that subset of mental illness was not "the issue." This, of course, is not to say (as we are accused of saying) that "expert testimony ....was not required in this case." *Post* at 982. We are saying that, given the level of proof of "mental illness" required for a "reasonable accommodation" defense under the Fair Housing Act, the trial court erred in rejecting the testimony of Sutton and Byrd, whose credentials and experience in the mental health field—including experience with the tenant herself—were adequate under the statute to permit their opinions in evidence here. How far a court should go in admitting even less expert—indeed, purely lay—testimony as to mental illness in some other "reasonable accommodation" case will depend on the facts. But we are not close to purely lay opinion here.

This case truly is a sad one for all concerned. But the Fair Housing Act, as interpreted by the federal courts, mandates "reasonable accommodation" of a tenant's mental illness. If the trial court had granted a brief stay to test the limited accommodation that tenant's counsel had in mind, the prospects for accommodation could have been resolved with dispatch and the landlord protected with an immediate right of entry if—and whenever—the proffered cleaning resulted in default. Unfortunately, however, that did not happen; the tenant was evicted; and the case must be remanded for whatever relief is appropriate under the circumstances.

*Reversed and remanded.*

SCHWELB, Associate Judge, dissenting:

I regret that I am unable to agree with the disposition of this appeal by my colleagues in the majority. The court reverses a judgment of possession entered in favor of the landlord even though, in flagrant violation of the lease and of the law, the tenant, who was said to be suffering from a "mood disorder," had turned a clean and sanitary apartment into a filthy and foul-smelling one. Indeed, by the time the case came to trial, the tenant had lived in the most unsanitary (as well as unlawful) conditions for almost a year since the situation was discovered, and for ten months since she received a notice to cure or quit. During that time, neither the tenant nor the District had taken any appreciable steps to ameliorate conditions which impaired the quality of life for the tenant's landlord and fellow tenants, as well as for herself. Subsequently, once the suit was brought, the tenant declined to participate or cooperate in any way.

Under the majority's analysis, which ignores or misapprehends both the severity and the duration of the tenant's failure to carry out her responsibilities, the landlord's obligations in an all but impossible

situation are virtually limitless. In fact, the landlord, whose remarkably reasonable and even lenient attitude is reflected in remarks by the trial judge which are quoted at length in the majority opinion, *ante* at pp. 955–56, is nevertheless faulted for supposed unwillingness to negotiate, and is even said to be violating the law by exercising its right to seek judicial redress. By contrast, the majority disregards the protracted violation by the tenant of her lease and of District of Columbia regulations, as well as her refusal to participate in the lawsuit, and treats the tenant as the aggrieved party. Consequently, as a practical matter, the tenant—apparently because she drinks and because she may have a "mood disorder" for which she refuses to be treated—is not held accountable for anything at all.[1] The result of the court's disposition is that the party that did the wrong wins and the party that suffered the wrong loses.

In my opinion, the trial judge handled this case fairly and judiciously, and all of his rulings were reasonable and legally correct. I am satisfied, as was the judge, that counsel for Evelyn Douglas, the tenant,[2] who represented his client conscientiously and resourcefully, was nevertheless unable to establish any of the elements of a federal Fair Housing Act defense sufficiently to permit the presentation of that defense to the jury. Specifically:

1. Ms. Douglas did not present competent evidence showing that she was, in fact, suffering from a relevant handicap, *i.e.*, a mental impairment, within the meaning of the Act. In ruling to the contrary, the majority has all but ignored some of the most significant parts of the testimony of the tenant's two witnesses on the subject, James B. Sutton, Jr., and Damon Byrd, in which both men acknowledged or demonstrated their lack of qualifications to opine on the issue. Moreover, my colleagues have almost completely (and inexplicably) ignored the applicable standard of review.[3]

2. I have considerable doubt, as did the trial judge, regarding whether what counsel for Ms. Douglas requested in this case was an "accommodation" within the meaning of the Fair Housing Act at all; the court was not asked to direct the landlord to relax a generally applicable rule in order to ease the burden on Ms. Douglas, but was urged instead to

---

1. It is undisputed that Ms. Douglas made the unit filthy and kept it that way. Nevertheless, the majority proclaims, *ante* at p. 970, that "we cannot, nor should our dissenting colleague, fault the tenant for a 'protracted period' of unsanitary conditions."

2. I say "counsel for ... the tenant" because Ms. Douglas herself refused to come to court or to cooperate in any way, indicating instead that "Jesus is going to take care of it." In fact, as I explain below, the case could not be settled on any terms because Ms. Douglas' attorney was unable to locate his client in order to convey to her the landlord's offer of settlement. Thus an appeal that has triggered the filing of three *amicus curiae* briefs will, in all probability, "make law"—erroneous law, in my view—but will accomplish nothing for Ms. Douglas herself; an award of damages to Ms. Douglas, on these facts, would surely be completely beyond the pale.

3. The majority dismisses the judge's extensive and thoughtful discussion of Ms. Douglas' alleged handicap, which I have quoted *infra* in Part II A, at pp. 980–81 of this opinion, as "manifestly erroneous," (quoting *In re Melton*, 597 A.2d 892, 897 (D.C.1991)) (en banc). See *ante* at p. 964 n. 30 and accompanying text. In fact, the *Melton* decision, read as a whole, stands for the proposition that an appellate court owes substantial deference to the trial judge's assessment of the qualifications of expert witnesses. *Melton* therefore cannot be reconciled with the majority's refusal to give the judge's analysis any weight at all. See also discussion at pp. 982–83, *infra*.

permit demonstrably unlawful[4] conditions, that had already existed for a year, to continue for an indefinite period. Assuming, *arguendo,* that the action requested by the tenant qualifies as an accommodation, it assuredly was not a reasonable one, for it is not reasonable to prolong indefinitely a flagrant violation of the law. Moreover, the "accommodation" ultimately proposed by the tenant was contingent on actions by the District, which had dealt with Ms. Douglas for many months but had done nothing to resolve the situation, and on the cooperation of the tenant, who refused to cooperate and was nowhere to be found.

3. The majority repeatedly suggests that the tenant needed no more than a week or two to come into compliance, and that the judge erred by not staying any eviction for a brief period. But in light of the history of the case, as well as the District government's inaction and the tenant's lack of cooperation, there was no realistic prospect that the situation would change for the better any time soon. Even if—and on this record it is a gargantuan and almost droll "if"—representatives of the District were suddenly to "shape up and fly right" and to clean the apartment within a week or two of an order of the trial court, there would be no assurance (or reason to believe) that the unit would remain clean. If it did not, there would of course be more allegations and denials, more litigation, more delay, and more arguable violations of the lease and of the law, and it is naive indeed to suppose that the case would quickly be over. Moreover, given the state of the apart-

ment over a long period of time, as well as the tenant's lack of interest in and absence from the pretrial proceedings and from the trial, no impartial jury could reasonably find the proposal made by counsel for the tenant to be a "reasonable accommodation" (and, in my opinion, no reasonable jury would have so found).

4. According to the majority, the landlord violated the Act by not responding to a letter dated February 20, 2002, from the tenant's attorney, and thereby failing to engage in a "constructive dialogue" with the tenant. The majority asserts that the trial judge erred by not taking note of this failure on the landlord's part and by not ascribing fault to the landlord. This alleged trial court error comes "out of the blue," for no claim was made to the trial judge, or in this court, that the lack of a response to the tenant's letter violated the Fair Housing Act. Moreover, the letter from the tenant's counsel on which my colleagues' theory rests is barely mentioned, if it is mentioned at all,[5] in the tenant's brief, and never in reference to any claim of a refusal by the landlord to negotiate.

In any event, the uncontradicted evidence shows that the tenant's counsel did not present a proposal containing any meaningful description of the requested accommodation, or addressing at all the time that such an accommodation would take to implement, until shortly before the trial, and even then the proposal remained vague as to when and how often the unit would be cleaned. Indeed, it was *the tenant* who made herself unavailable to respond to the

---

4. See note 12, *infra.*

5. The tenant's brief states that the plaintiff was advised of the request to the DCRA by letter. The record citation in the brief for this letter is incorrect, *see* R.171, and the reference may or may not be to the February 20 letter.

landlord's offer of settlement. It is unreasonable to fault the landlord for not engaging in a hypothetical dialogue in which the tenant has shown no disposition to participate. Further, a party has a constitutional right to seek judicial redress and to ask the court to determine the merits of its claim, and the landlord could not and did not violate the Fair Housing Act by successfully pursuing its request for judgment, especially in the absence of any ruling that the tenant was in fact suffering from a relevant mental impairment and thus entitled to a "reasonable accommodation." The duty to accommodate arises only if the tenant has a handicap that precludes her from complying with a generally applicable rule—a contested issue which no impartial participant in the proceedings has answered in the affirmative before today.

5. Even if one were to assume that the "accommodation" requested on behalf of the tenant was reasonable—an assumption that, in my view, cannot withstand scrutiny—her counsel's proposal was made after the unsanitary conditions in her apartment had existed for a protracted period [6] and after a suit for possession had been instituted. Although this is a fairly close call, the trial judge could, in my view, reasonably conclude, as a matter of law, that in light of this history, the request came too late. As I show below, the tenant's theory that a request for accommodation is timely if it is made at any time before the tenant has actually been evicted (and that, un-der the Act, a timely request automatically bars the landlord from continuing to pursue eviction) leads to unreasonable results which, in my judgment, Congress could not have intended.

6. Although the court ostensibly recognizes that the Act denies protection to any individual whose tenancy would constitute a direct threat to the health and safety of others, or would result in substantial danger to property, my colleagues effectively nullify this provision by allowing a condition constituting an evident—and unlawful—threat to person and property to continue indefinitely even after it has already existed for a very long time.[7]

The federal Fair Housing Act was enacted in 1968 pursuant to the authority of Congress under the Thirteenth Amendment to eliminate badges and incidents of slavery. See *Jones v. Mayer Co.*, 392 U.S. 409, 442–43, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) ("[W]hen racial discrimination herds men [and women] into ghettos and makes their ability to buy property turn on the color of their skin, ... it ... is a relic of slavery."); *United States v. City of Black Jack*, 508 F.2d 1179, 1184 (8th Cir.1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *United States v. Youritan Constr. Co.*, 370 F.Supp. 643, 648 (N.D.Cal.1973), *modified on other grounds* and *aff'd*, 509 F.2d 623 (9th Cir.1975). The Act was broadened in 1974 to prohibit discrimination based on sex and later, in 1988, to proscribe discrimination based, *inter alia*, on handicap. *See* the Fair Hous-

---

6. As I show in Part II C(4), *infra,* the majority's attempt to place the blame on the landlord for the duration of the violation is unfair and unjustified.

7. I leave it to the reader to judge whether these six points, on each of which I elaborate in this opinion, are fairly synopsized in the opening of the majority's "Response to Dissent." *Ante* at pp. 968–71. Remarkably, my colleagues fail even to mention the illegality of the condition which Ms. Douglas created and perpetuated, and which is central to this dissent.

ing Amendments Act of 1988 (FHAA), Pub.L. No. 100–430, 102 Stat. 1619 (1988).[8]

Equal housing opportunity was, and remains, a noble goal—the legislation was, after all, named the *Fair* Housing Act. The statute was initially enacted in order to counteract centuries of "deliberate racial discrimination in the housing market by the real estate industry and by agencies of the federal, state, and local governments," *Black Jack*, 508 F.2d at 1186, and it now proscribes discrimination based on other invidious grounds as well, including physical or mental handicap. But the law is also supposed to be fair to the public and to landlords; courts are to "minimize federal intrusion and ... assure that [landlords] be permitted to retain maximum control of their business operations consistent with the assurance of equal housing opportunit[y]." *United States v. West Peachtree Tenth Corp.*, 437 F.2d 221, 228–29 (5th Cir.1971) (model decree).

In this case, the majority denies relief to the landlord from an intolerable and unlawful condition that had existed on the landlord's property for a very long period of time, with no relief realistically in sight in the absence of an eviction. The judge, in my view, could reasonably conclude as a matter of law that the record did not support the submission to the jury of a Fair Housing Act defense. The judge also correctly ruled that, upon the jury's verdict, Kriegsfeld was entitled to immediate judgment of possession. The views of my colleagues to the contrary notwithstanding, I am satisfied that Congress could not have contemplated or even imagined the result that the court reaches today. Respectfully, therefore, I dissent.

## I.

### FACTUAL BACKGROUND

Although my colleagues do not ascribe very much significance to dates and times, any fair and meaningful analysis of the record before us requires an understanding of the sequence of events, of the duration of the tenant's noncompliance, and of the severity and illegality of the conditions that existed while so much time was passing. I shall therefore begin by describing the main occurrences in this dispute in the order in which they occurred.

On January 2, 2001, Evelyn Douglas, a woman in her fifties who had long abused alcohol, who allegedly suffered from a "mood disorder," but who adamantly refused treatment, signed a lease for an apartment at 1430 W Street, N.W. Her landlord was the Kriegsfeld Corporation. Ms. Douglas acknowledged, by signing the lease, that she had inspected the apartment and that it was in good condition. She further agreed to "keep my apartment in good order and repair, and at the end of my occupancy to return my apartment in such good condition, ordinary wear and tear excepted." The lease also provided that the "[t]enant will not do or permit to be done in said premises anything which will create unsanitary or unhealthy conditions or which will otherwise create the risk of infestation of rodents or other vermin."

On July 13, 2001, Ms. Douglas had occupied her apartment for approximately six months. On that day, there was an emergency in the unit directly above hers. Deborah Reid, the property manager for Kriegsfeld, proceeded to Ms. Douglas' apartment for the purpose of determining whether it had sustained any water dam-

---

8. Although, in this opinion, I refer both to the Fair Housing Act as a whole and to the FHAA in particular, the dispositive legal issues in this case turn on the proper interpretation of the FHAA.

age.[9] When Ms. Reid had walked "about halfway down the steps," she smelled an odor which she characterized as "almost undescribable." According to Ms. Reid, "it smelled like a porta-potty." When Ms. Douglas opened the door, the odor

> just hit you in the face. It was just unbearable to the point where you had to hold your breath, you know, to try and kind of not smell what was coming out of her unit.

Inside the unit, clothes were strewn in the hallway, and trash and newspapers were lying on the floor. The toilet was "working fine," but it was stopped up, apparently because Ms. Douglas had not been flushing it. There was garbage stacked in the kitchen, and open cans of food and open liquor bottles were lying around in the sink.[10] In addition, there were "bottles of [a] substance that looked and smelled like urine sitting around her unit."

Several days later, on July 26, 2001, Damon Byrd, a social worker for Adult Protective Services, visited Ms. Douglas' apartment. Mr. Byrd described essentially the same conditions that Ms. Reid had found, but he provided additional details. He testified that the sink was stopped up, that Ms. Douglas was trying to cook pork chops on a hot plate on the floor because the stove was inoperable, and that "the place was totally filthy." James B. Sutton, Jr., a Mental Health Specialist for the Department of Mental Health, who also visited the apartment in July 2001, told the court that the unit was in

> what I would describe as very deplorable condition. There was urine in bottles in the apartment; there was evidence of rodent infestation, [the] refrigerator was not operating; there was spoiled food in the apartment; [and] there was trash and other debris throughout the apartment.... [S]he and [an]other person [were] sleeping on a mattress; and there was water on the floor, on the carpet, and like I said ... the apartment was in [a] very bad condition.

In other words, according to all three witnesses,[11] Ms. Douglas was living in extraordinarily unsanitary conditions, the unit was essentially uninhabitable, and although Ms. Douglas' unit was in the basement, the intense and objectionable odor and the rodent infestation had potentially intolerable consequences for the apartment house and for its inhabitants. Obviously, from a health and safety perspective, the situation was legally impermissible and required *immediate* attention and correction.[12]

---

9. Ms. Reid testified at the jury trial, and her testimony was not available to the judge at the time that he ruled that counsel for the tenant would not be permitted to present the Fair Housing Act defense to the jury. Ms. Reid's testimony was uncontradicted, however, and this court is authorized to consider it. *See Patton v. United States*, 633 A.2d 800, 818 n. 11 (D.C.1993) (per curiam); *cf. In re T.L.L.*, 729 A.2d 334, 338 n. 3 (D.C.1999). In any event, the trial testimony was consistent with the evidence previously admitted during pretrial proceedings.

10. A photograph depicting the appalling condition of the sink was one of the landlord's most vivid trial exhibits.

11. Byrd and Sutton testified on behalf of Ms. Douglas at the pretrial hearing at which the court considered the question of whether counsel for the tenant would be permitted to raise a Fair Housing Act defense at trial. The two men were thus witnesses for the tenant, not for the landlord.

12. Ms. Douglas was in evident violation, *inter alia*, of the following sections of Title 14 of the District of Columbia Municipal Regulations (DCMR) (1991):

> 800.1 All premises occupied for residential purposes shall be kept in a clean, safe, and sanitary condition, including, but not limited to, the requirements of this chapter.

On August 23, 2001, an attorney for Kriegsfeld sent Ms. Douglas a "Notice to Cure or Quit," in which he advised her that she was violating the obligations of her tenancy by failing to maintain the apartment "in a clean and sanitary condition." He detailed the filth and accumulated trash and debris described by Ms. Reid, Mr. Byrd and Mr. Sutton, and he informed Ms. Douglas that the "unsanitary conditions cause or contribute to rodent and insect infestation."[13] Counsel wrote that Ms. Douglas had thirty days to cure the violations, and that if she failed to do so, she would be required to surrender possession no later than October 3, 2001. On October 4, Ms. Reid visited the unit again and found it in essentially the same condition as on her first visit. She took several photographs, all of which were subsequently admitted into evidence, depicting the state of the apartment.

Ms. Douglas neither "cured" the violations nor "quit" the unit in response to counsel's notice, and on November 30, 2001, Kriegsfeld filed its complaint for possession in the Landlord and Tenant Branch of the Superior Court's Civil Division. On December 21, 2001—the return date reflected on the summons—a Neighborhood Legal Services attorney appeared on behalf of Ms. Douglas. On January 25, 2002, following a continuance to which both parties consented, Ms. Douglas' attorney filed a "Verified Answer and Jury Demand" which included a counterclaim. Counsel alleged in the Answer that the "action for possession cannot be maintained because the defendant is entitled to a reasonable accommodation in her housing unit under the provisions of the Fair Housing Act and local fair housing laws." The requested accommodation was not further described. In the counterclaim, counsel alleged that Kriegsfeld had violated the Fair Housing Act, and had thus become liable to Ms. Douglas for damages, *"by seeking possession of defendant's unit through court process* and not affording the defendant a reasonable accommodation in her housing unit." (Emphasis added.) In other words, according to the tenant's attorney—and now, remarkably, according to the majority—the landlord was violating the Fair Housing Act simply by exercising its right to seek judicial redress, *i.e.,* by

---

800.2 Floors, floor coverings, and other walking surfaces shall be clean and free of dirt, dust, filth, garbage, human or animal wastes, litter, refuse, or any other unsanitary matter.

802.1 In those portions of premises occupied for residential purposes under the exclusive control of a tenant, it shall be the responsibility of the tenant to observe the provisions of this chapter, unless otherwise indicated in this chapter.

802.2 In addition to the tenant's responsibilities under § 800, the tenant shall specifically be responsible for the following:

(a) Keeping the part of the premises that the tenant occupies and uses as clean and sanitary as the conditions of the premises permit;

(b) Disposing from the tenant's dwelling unit all rubbish, garbage, and other organic or flammable waste, in a clean, safe, and sanitary manner;

(c) Keeping all plumbing fixtures as clean and sanitary as the condition of those fixtures permits.

Aside from the testimonial proof of noncompliance that I have summarized, violations of some of these provisions are apparent from the photographs that were admitted into evidence. My colleagues in the majority do not dispute, nor can they, the obvious fact that the conditions in the apartment were in violation of the law, and that the tenant's request for an "accommodation" therefore entailed the continuation of these unlawful conditions at least for some period of time.

13. Kriegsfeld's attorney also alleged in his letter that Ms. Douglas had violated the lease by refusing to permit management and maintenance personnel to enter her apartment for routine inspection, maintenance and repair.

asking the appropriate court to determine if, as the plaintiff in an action for possession, Kriegsfeld was entitled to the relief that it had requested!

On February 5, 2002, approximately two weeks after filing the Answer and Counterclaim, and almost half a year after the conditions in the unit were discovered by the landlord, Ms. Douglas' attorney sent a letter entitled "Request for Reasonable Accom[m]odation" to the Director of the Department of Consumer and Regulatory Affairs (DCRA). A copy of this letter is attached to this opinion as "Appendix A." As the trial judge subsequently noted, and as my colleagues acknowledge, the letter was quite vague as to the nature of the accommodation being requested. Counsel denied in the letter that his client had violated the lease, but he also asserted that Ms. Douglas had been diagnosed as suffering from a "mood disorder" and that any violations of the lease on her part should be attributed to that condition. In addition, according to counsel, "[t]he District of Columbia government [was] prepared to assist [Ms. Douglas] with cleaning the apartment," and Ms. Douglas had been referred to psychiatric outpatient treatment. No elaboration was provided with respect to the District's plans for cleaning or for providing psychiatric treatment. Counsel concluded by stating that the landlord "would only need to delay taking any further action to obtain possession of her unit and to afford her an opportunity to work with the District of Columbia government in resolving her disability issues as they relate to her current housing arrangement." No copy of this letter was sent to Kriegsfeld's attorney, who later advised the court that he did not see it until the day before trial. The tenant's request for relief was not very informative, for the particular accommodation desired was not specified and no timetable was provided. The DCRA took no action in response to the "Request for Reasonable Accommodation." [14]

On February 20, 2002, Ms. Douglas' attorney wrote a letter to Kriegsfeld's counsel. A copy of this letter is attached hereto as Appendix B. The letter to the landlord's attorney was similar to, and no more detailed or informative than, the letter to the DCRA; counsel reiterated, however, that "Ms. Douglas would like to remain and seek treatment and counseling for her disabling conditions." [15] Once again, the particular accommodation desired was not specified, nor was a timetable provided. In the Joint Pretrial Statement filed on April 11, 2002, counsel for the tenant contended that Ms. Douglas was entitled to an accommodation and to remain in possession, but he again did not describe at all the desired accommodation. At least so far as the record discloses, counsel for the tenant did not add any flesh to the bare bones of his proposal until about a week before trial, and even then the bones remained pretty bare.

On April 17, 2002, the trial judge held a pretrial conference and issued a pretrial order. Ms. Douglas, who had been unavailable to her counsel for some time, did not personally attend the conference. In her absence, no settlement was feasible at pretrial. The judge directed the parties to file memoranda addressing "whether the

---

14. Ms. Douglas' attorney asserts that, by taking no action, the DCRA "granted" the request for accommodation and that the regulations so provide. The notion that the agency could approve a demand as vague as this one without the landlord having any notice of it is absurd, and the majority has wisely chosen not to rely on such a theory.

15. In fact, as Ms. Douglas' attorney acknowledged in his brief in this court, Ms. Douglas had adamantly refused treatment.

defendant's [alleged] disability can be raised as a defense." A jury trial was set for June 17, 2002.

In early June, a new attorney (from the same law firm as his predecessors) took over the representation of the landlord,[16] and he initiated settlement discussions with counsel for the tenant. It was apparently at this point that the attorneys first talked about the proposal that the action be stayed pending efforts by the District to clean up the apartment; counsel for the landlord objected that the proposal was too vague, because the tenant's attorney could not speak for the District and because there was no assurance when the unit would be cleaned or whether it would stay clean.

On the scheduled trial date, Ms. Douglas once again failed to appear. The judge inquired of counsel regarding the status of any settlement negotiations. Kriegsfeld's attorney stated that he had made an offer to Ms. Douglas' attorney, but the latter explained that he had been unable to communicate the offer to his client.[17] The judge decided to proceed with the trial notwithstanding Ms. Douglas' absence.

On June 18, 2002, in a comprehensive oral opinion, the judge ruled that the tenant would not be permitted to present a "reasonable accommodation" defense pursuant to the FHAA. The landlord prevailed at the jury trial that followed, and a judgment of possession in Kriegsfeld's favor was subsequently entered. Counsel for Ms. Douglas filed a timely notice of appeal. Requests for a stay of the judgment pending appeal were denied by the trial court and by this court.

## II.

## LEGAL ANALYSIS

### A. The existence of a handicap.

In my opinion, the judgment of the trial court may and should be affirmed without reaching the "reasonable accommodation" issue. The trial judge found that the witnesses called by Ms. Douglas' attorney were not competent to establish that Ms. Douglas was suffering from a mental impairment that led to the unsanitary condition of her apartment. If the correct standard of review were being applied, the

---

16. The new attorney, Timothy P. Cole, was substituted by landlord's counsel by a consent order dated June 12, 2002.

17. Ms. Douglas' attorney stated:
    I was perfectly willing to entertain any settlement offer, but I would need to speak with her. I tried to, when I went there to deliver the letter to tell her to be here today, but I had no contact with her....
    Although this would have been the obvious occasion for the tenant to assert the theory that the majority now adopts—that counsel for the landlord had "refused to negotiate" from February to June—Ms. Douglas' attorney made no such allegation.
    At the conclusion of the June 17, 2002 hearing, the following exchange occurred between Ms. Douglas' attorney and the judge:
    [COUNSEL FOR MS. DOUGLAS]: Well, the only thing I could say is since the case

began, Mr. Cole didn't have the advantage of being involved in the case, but since he's got involved in the case there has been some discussion. The other two attorneys, not any disrespect or anything like that, but we just didn't have discussions along this line at all. Mr. Cole made overtures last week about settlement. That had never come up before. Mr. Cole did–
    THE COURT: I mean, I recognize you are in a difficult position because you can't communicate with your client.
    This exchange cannot reasonably be understood as an allegation that counsel for the landlord had refused to negotiate and was therefore responsible for the duration of the unsanitary conditions in Ms. Douglas' unit. If that had been the position of counsel for the tenant, he would surely have known how to express it forcefully and clearly.

judge's determination would have to be sustained.

The judge gave this question careful consideration. Early in the proceedings, before hearing the testimony of Mr. Sutton and Mr. Byrd, he remarked that "[t]here are plenty of people who have mental disabilities who can keep their apartments clean, [and] there are plenty of people who don't have mental disabilities who don't keep their apartments clean." The judge observed that if, for example, a mentally impaired individual's principal symptom was that she talked over the telephone for ten hours a day, then that person's handicap would not necessarily have any relationship to her ability or inability to maintain a sanitary apartment. Consequently, in the judge's view, the tenant was required to present a witness or witnesses who could establish, "to a reasonable degree of medical certainty, . . . or to some standard that had some basis to it, . . . that the mental status of this person caused her to not be able to maintain her apartment appropriately . . . [or] . . . consistent[ly] with the lease requirements." The judge indicated that he would hear the testimony of the tenant's proffered witnesses, Sutton and Byrd, outside the presence of the jury, to determine whether one or both could be "qualified as an expert to give such an opinion."

After Sutton and Byrd had testified, and after the judge had heard further argument, he ruled that neither witness was competent to state an opinion regarding the issue at hand. I find the judge's reasoning persuasive, and I quote from his oral ruling at length:

> Two necessary elements of any [FHAA] discrimination defense are, first, that the defendant has a mental disability; and second, that the defendant's mental disability prevented her from maintaining her apartment in a clean and sanitary condition. Or to put it another way, the second element would be that her mental disability caused her [18] not to maintain her apartment in a clean and sanitary condition. That is, that the defendant had a mental disability which caused her to violate the terms of her lease.
>
> This is a kind of causation concept, [it] is one that we talked about yesterday, and I wasn't sure that I was—that the defense was in full agreement that that was a requirement, but in rereading this morning the Court of Appeals' decision in *American University v. Commission on Human Rights,* 598 A.2d 416, at 424, a D.C. Court of Appeals decision from 1991 that was cited in the pleadings by the plaintiff, I realized that the Court of Appeals specifically holds in that case that in a discrimination case—that was an employment discrimination case, but I don't think it makes any difference—part of the claim has to be not only that the person has a disability, but that the person's disability causes the person's inability to do a particular part of the job. That was what the context was there, as opposed to simply saying the person has a disability. And so I read *American University v. Commission on Human Rights* as standing for the proposition consistent with what I was saying earlier that the defense would have to show not only that the defendant has a mental disability but also that her mental disability has either prevented her from maintaining her apartment in a clean and sanitary condition or caused her not to do so.

---

**18.** In my opinion, a substantial relationship would be sufficient, without proof of actual causation.

Now, in light of this, I have considered the testimony of James Sutton and Damon Byrd to try to determine whether, either separately or together, it is sufficient or would be sufficient to establish these necessary elements, and I have concluded that it would not be. By their own admission, neither of these two witnesses is qualified to render an opinion regarding what mental illness, if any, the defendant suffers from. Both witnesses were clear that they do not make mental health diagnoses as part of their jobs or as a regular course in any other context. Indeed, neither witness even knew what the diagnosis made by a psychiatrist in December 2001 meant. That diagnosis was mood disorder and not otherwise specified, and neither witness could tell me what that meant, indicating a lack of familiarity with mental health diagnoses.

Both witnesses also, in my view, are unqualified to testify regarding the symptoms of the mental disorder of mood disorder, NOS, or not otherwise specified, and thus both witnesses are unqualified to testify regarding any causal link between the defendant's mental state and the condition of her apartment.

The judge went on to hold, again citing the *American University* decision, that expert testimony was required in order to establish Ms. Douglas' mental condition and to prove a causal relationship between her alleged handicap and her inability or unwillingness to maintain a sanitary apartment.

Under familiar standards of appellate review, the judge's ruling regarding the insufficiency of the qualifications of Sutton and Byrd to establish the existence of a mental impairment must be accorded great weight. As our predecessor court, the Court of Municipal Appeals, stated well over half a century ago, "it has long been settled that the qualification of an expert witness is largely within the discretion of the trial court, and is not usually the subject of appellate review." *Gertner v. Newrath*, 49 A.2d 655, 656 (D.C.1946). More recently, the en banc court elaborated on the point:

"The trial judge has wide latitude in the admission or exclusion of expert testimony, and his decision with respect thereto should be sustained unless it is manifestly erroneous." *Coates v. United States*, 558 A.2d 1148, 1152 (D.C.1989). The question whether an expert has been sufficiently qualified is likewise "recognized as a matter for the trial judge's discretion reviewable only for abuse. *Reversals for abuse are rare.*" E. CLEARY, MCCORMICK ON EVIDENCE § 13, at 34 (3d ed.1984).

*In re Melton,* 597 A.2d at 897 (emphasis in original; footnote omitted).

This is not one of the "rare" cases in which an appellate court should override the trial judge's exercise of discretion as to the witnesses' qualifications. Both Sutton and Byrd testified, on the basis of December 2001 notes written by a psychiatrist who examined Ms. Douglas, that Ms. Douglas was suffering from a "mood disorder NOS," but neither man knew what NOS stands for or what a "mood disorder NOS" is. Sutton acknowledged that he is not licensed to diagnose a mood disorder. Byrd asserted that he was qualified to make a "psychiatric diagnosis of someone like Ms. Douglas," but he based this claim on his Master's degree in *social work.* Byrd later conceded that he did *not* make psychiatric diagnoses; as to Ms. Douglas, he believed that "there is something wrong here. The exact diagnosis, I'm not able to put my finger on. I'm not going to stretch that." Finally, Sutton acknowledged that in the December 2001 psychiatric notes on

which he relied, there was nothing which addressed the question whether Ms. Douglas' alleged "mood disorder" was or was not the cause of the unsanitary condition of her apartment.

According to the majority, expert testimony from someone who understood the specific condition with which Ms. Douglas was allegedly afflicted was not required in this case either to establish that Ms. Douglas suffered some identifiable mental ailment or to prove the requisite connection between her alleged illness and her failure to comply with the requirements of her lease and with the law. I find this proposition very difficult to reconcile with our *American University* decision.[19] But even assuming that what amounted to lay testimony could be sufficient to prove that Ms. Douglas suffers from a relevant handicap—and, in light of *American University,* it cannot—our standard of review still precludes reversal. This is so because

> "[t]he courts and other authorities uniformly agree that the receipt of opinion evidence, *whether lay or expert,* and the extent to which it will be received in any particular case, are matters resting largely in the administrative discretion of the court."April 28, 2004

1 JOHN W. STRONG, MCCORMICK ON EVIDENCE § 11, at 46 n.13 (5th ed.1999)(emphasis added) (quoting *Grismore v. Consol. Prods.,* 232 Iowa 328, 5 N.W.2d 646, 654 (Iowa 1942)). Thus, "the trial judge should have broad discretion in deciding whether or not to permit [lay] opinion testimony." *United States v. Pier-*

*son,* 164 U.S.App. D.C. 82, 85, 503 F.2d 173, 176 (1974). This wide latitude "necessarily includes broad discretion to ascertain if the testimony is supported by a proper foundation." *Amwax Corp. v. Chadwick,* 28 Conn.App. 739, 612 A.2d 127, 130–31 (1992) (citations omitted). "[T]he admissibility of the evidence of lay witnesses to the mental capacity of a testator is a matter in the sound discretion of the trial court." *Obold v. Obold,* 82 U.S.App. D.C. 268, 269, 163 F.2d 32, 33 (1947) (per curiam). By analogy, considerable deference must also be accorded to the trial judge's decision in regard to whether he should permit the lay testimony of Mr. Sutton and Mr. Byrd to be presented to the jury.

My colleagues assert that deference is not required here because "the court's requirement of expert testimony to explain a particular diagnosis of mental illness sets the bar too high for establishing the existence of 'mental impairment' under the Fair Housing Act." *Ante* at p. 964. In other words, the tenant needs only to prove impairment, and need not identify its nature—a showing of any kind of mental impairment will do. The illogic of this argument is apparent. A tenant might be impaired because he believes that he is Napoleon or Pele, but this would not prevent him from cleaning his apartment; if he failed to clean it, the cause might well be laziness, rather than his imagined identities. Another tenant might be eccentric rather than mentally ill, and might let his unit become filthy as a result of his eccentricity.[20] Witnesses like Sutton and Byrd,

**19.** The court stated in that case:

Unlike some other handicaps, the causes and effects of [mental-illness] and the extent to which the symptoms of the illness can be controlled by medication and therapy are beyond the ken of the average lay person. Where proof of an issue is related to a science or profession beyond the ken of an

average lay person, expert testimony is required.

598 A.2d at 423. The "causal nexus" between the plaintiff's alleged disability and her work performance likewise required expert testimony. *Id.* at 423–24.

**20.** The writer of this dissenting opinion has a sign on his wall stating that "[a] cluttered

who did not know what the tenant's alleged ailment—"mood disorder NOS"—means, were in no position to opine whether that condition did or did not prevent the tenant from adhering to minimal sanitary standards. The trial judge so concluded, and, in my opinion, the majority's characterization of that conclusion as "manifestly erroneous" is unwarranted. To put my point another way, if the tenant is to be excused from complying with her lease (and, in this case, with the law), then there should be a persuasive showing by competent witnesses that she suffers from a real and relevant (and therefore also identifiable) mental illness which prevents her from keeping her unit clean. It is also incumbent upon the tenant to prove that she is not merely an eccentric but sane individual who has elected to march to the beat of a different drummer and to eschew conventional hygiene in doing so.

But, say my colleagues: "Nor, in this particular case, is much expertise required to show that the tenant's mental impairment, combined with alcohol abuse, was a contributing cause of the unsanitary condition of her apartment.... [O]n this record, it is not readily apparent what [other] explanation there might be ...." *Ante* at p. 964. Surely this approach proves too much. If taken to its logical conclusion, the majority's analysis suggests that if the tenant has a very unsanitary apartment, she must have a mental illness too; the more extreme the condition of the apartment, the more mentally ill she must be. At the very least, this line of reasoning provides rather perverse incentives insofar as hygienic considerations are concerned. I do not believe that having an unsanitary apartment, standing alone, shows that Ms. Douglas suffers from a relevant mental condition warranting an exemption from the rules and regulations made applicable

to other tenants by the lease (and by District of Columbia regulations requiring tenants to maintain sanitary conditions). It is difficult to believe that my colleagues disagree. The additional fact that two witnesses believed that she has a "mood disorder NOS," but did not know what this phrase meant, cannot support a conclusion that the trial judge abused his discretion by holding that the witnesses were not sufficiently qualified to establish a mood disorder and its causal link to the unsanitary condition. It is no minor matter to proclaim that a tenant is excused for any period from maintaining sanitary conditions in her unit, especially when other tenants reside in the same apartment house and suffer from her actions. If someone who has done to her apartment what Ms. Douglas has done to hers is to be entitled to special protection (and, effectively, to preferential treatment to compensate for her alleged handicap), then surely the court should require a meaningful showing that the defendant has a recognizable mental illness and that this illness is so severe that it prevents her from keeping her apartment reasonably clean.

The majority also finds it to be "important to note" that "handicap," as defined in the Fair Housing Act, applies not only to a person with a "mental impairment" but also to someone who is "regarded as having such an impairment." 42 U.S.C. § 3602(h). This rather open-ended provision, important or not, does not tell us "regarded by whom," and, in general, it is not characterized by the most luminous clarity. One would suppose that if A, an idiot, mistakenly regards B, a genius, as an imbecile, then B should not thereby be entitled to "accommodation," *i.e.,* to more favorable treatment than other tenants receive, from C, B's landlord. Indeed, if B is

desk is a sign of genius." The description of    the desk as cluttered is correct.

in fact a genius, it makes little sense to accord him protection even if it is C, the landlord, who erroneously believes that B is a fool. On appeal, counsel for Ms. Douglas nevertheless asserts that the statute "means that an individual seeking protection under the Act could have no impairments otherwise defined or identified by the Act, but if they [sic] are treated [regarded?] by another person as having an impairment, then the person is handicapped within the meaning of the Act and therefore, can be afforded protection." In other words, to return to my example, A supposedly can confer special privileges and preferential treatment on tenant B, and impose burdensome requirements on landlord C, simply by incorrectly "regarding" B as handicapped. If the law says that, then, in Charles Dickens' famous phrase, the law "is a ass, a idiot," and I do not believe that Congress intended such a manifest absurdity.[21] But in this case, in any event, we need not reach the issue, for, so far as my examination of the record has revealed, and as my colleagues acknowledge by their silence, no claim based on the statutory phrase "being regarded as having an impairment" was presented to the trial court, and the point therefore has not been preserved for appeal. *Miller v. Avirom*, 127 U.S.App. D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967).

One final thought on this issue. According to her counsel's brief on appeal, "Ms. Douglas suffered from mental problems, abused alcohol, *and was refusing any and all treatment by a psychiatrist.*" (Emphasis added.) The State should look after those persons who cannot care for themselves. Rightly or wrongly, the Nanny State goes further and looks after those who could fend for themselves but will not. I do not believe, however, that by enacting the protections for handicapped people in the FHAA, Congress intended to make every landlord a potential Nanny for individuals, like Ms. Douglas, who refuse to help themselves.[22]

B. *The request for an accommodation.*

Even if one assumes, *arguendo*, that Ms. Douglas suffers from the requisite "mental impairment" qualifying her for protection under the FHAA, I question, as did the trial judge, whether the action that Ms. Douglas wanted the landlord to take constitutes an "accommodation" within the meaning of the Act. I do not believe that the record in this case presents the type of situation which the "reasonable accommodation" provision was intended to address.

Under the Act, a discriminatory practice includes

a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.

42 U.S.C. § 3604(f)(3)(B). As the court explained in *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501–02 (10th Cir.1995) (quoting *Oxford House, Inc. v. Township of Cherry Hill*, 799 F.Supp. 450, 462 n. 25 (D.N.J.1992)), making "a reasonable accommodation involves changing some rule

---

21. The provision could arguably make sense if "regarded" is held to mean *"reasonably"* regarded, but counsel has suggested no such limitation.

22. Counsel for Ms. Douglas, as well as the three *amici curiae*, are all concerned, and properly so, about the prospect of Ms. Douglas becoming homeless. Surely, however, any responsibility for looking after people in her situation falls on the District government, not on the landlord. Kriegsfeld should not be required, in the cause of fighting homelessness, to accept indefinitely a tenant who is in extreme and protracted violation of her lease and of the law.

that is generally applicable so as to make its burden less onerous on the handicapped individual." *Accord, Keys Youth Servs. v. City of Olathe,* 38 F.Supp.2d 914, 924 (D.Kan.1999) (internal quotation marks omitted); *Alliance for the Mentally Ill v. City of Naperville,* 923 F.Supp. 1057, 1078 (N.D.Ill.1996); *N. Shore–Chicago Rehab., Inc. v. Vill. of Skokie,* 827 F.Supp. 497, 499 (N.D.Ill.1993).

A number of cases decided under the Act illustrate the types of situations at which this provision was aimed. In *Shapiro v. Cadman Towers, Inc.,* 51 F.3d 328, 336 (2d Cir.1995), a housing provider was required to modify its "first-come first-served" parking policy to grant a parking space to an individual who suffered from multiple sclerosis. In *Bronk v. Ineichen,* 54 F.3d 425, 428–29 (7th Cir.1995), the court recognized that, in an appropriate case, a landlord could be required, as a reasonable accommodation, to modify its "no pets" policy so as to permit a deaf tenant to keep a hearing dog. In *Crossroads Apts. Assocs. v. LeBoo,* 152 Misc.2d 830, 578 N.Y.S.2d 1004, 1005–07 (City Ct. Rochester, N.Y.1991), the court concluded that a genuine issue of material fact barred summary judgment in favor of a landlord where a mentally ill tenant claimed (on the basis, *inter alia,* of his psychiatrist's affidavit) that he needed to retain his cat, in contravention of the landlord's "no pet" policy, in order to deal with his depression and anxiety.

In the present case, counsel for Ms. Douglas has not requested that any rule, policy or practice be relaxed for her.[23] He does not claim, nor could he, that the provision of the lease requiring his client to maintain her unit in good order and repair, and prohibiting her from creating unsanitary or unhealthy conditions, should be inapplicable to her because she is alleged (by counsel) to be mentally ill. Counsel has not even requested that the landlord help Ms. Douglas to keep the unit clean; on the contrary, Ms. Douglas has sometimes apparently excluded management and the maintenance staff from her apartment (and counsel could provide no assurance that she would admit them in the future). Rather, as Kriegsfeld persuasively argued to the trial court,

> [w]hat the [d]efendant seeks is not simply a bending of the rules or policies of the [p]laintiff housing provider, but a demand that the D.C. laws regarding sanitation and health be disregarded because the [d]efendant is not capable of maintaining an apartment within the standards required by D.C. [l]aw. District law unambiguously requires tenants to keep their units "as clean and sanitary as the conditions of the premises permit." DCMR Title 14 § 802.2. Bending a rule is one thing, requiring a landlord and the D.C. Government to ignore the laws on public sanitation and safety is something altogether different and ... clearly does not constitute a reasonable accommodation request.

When the remedy sought is something other than the relaxation or bending of a rule to make that rule less onerous for the person claiming to be handicapped, it is not an accommodation within the meaning of the Act. *Bangerter,* 46 F.3d at 1502.

In the "Request for a Reasonable Accommodation" which Ms. Douglas' attorney sent to the District government on February 5, 2002, he asked "that the housing provider *terminate all efforts to obtain*

---

**23.** The majority asserts that Ms. Douglas was, in effect, asking for an extension of the "cure or quit" period, *ante* at p. 962, and that this was the requested accommodation under the Fair Housing Act. If that was indeed the tenant's demand, then by the time the judge was called upon to rule, it was for a very very very long extension.

*possession of her unit* and provide a reasonable accommodation suitable to all parties." (Emphasis added.) Counsel represented in the letter that "[t]he District of Columbia government is prepared to assist [Ms. Douglas] with cleaning the apartment," and that the landlord "would only [24] need to delay any further action to obtain possession of her unit and to afford her an opportunity to work with the District of Columbia government in resolving her disability issues as they relate to her current housing arrangement." In other words, counsel was requesting that Ms. Douglas be permitted to stay in the unit until the District had helped to clean it and had "resolv[ed] her disability issues."

The majority repeatedly refers to the requested "accommodation" as being for quite a short time, *i.e.*, "a brief stay of eviction to allow an agency of the D.C. government ... to clean the premises." *Ante* at p. 961. In the real world, however, it takes a very long time to induce the bureaucracy to move in a case like this,[25] and perhaps longer still to resolve an uncooperative patient's "disability issues." In fact, even on the trial date, Ms. Douglas' counsel was unable to tell the court how long a delay he was requesting:

> THE COURT: How much time did she ask for?
>
> [COUNSEL FOR MS. DOUGLAS]: As I stated, she's mentally ill.

Subsequent estimates of "one day," or a week or two, now seized on by the majority, were, in my judgment, hopelessly unrealistic, especially where, as here, the ten-

ant was not cooperating and was not even around. See pp. 38–39, *supra.*

According to my colleagues, everything would be all right, because Ms. Douglas' attorney "had a responsibility to ensure her understanding, acceptance, and support of the terms of a court-ordered stay." *Ante* at p. 969. Respectfully, this is a complete mirage; it is undisputed that, for several months, conscientious counsel for the tenant had no idea where his client was! I gather that, according to the majority, it was the trial judge's obligation to ignore this rather significant fact. Practicality is not everything, but it is sometimes worthy of consideration.

In his discussion with the attorneys on the morning of the trial date, the judge expressed understandable consternation regarding exactly what counsel for the tenant was demanding:

> There is going to have to be some specific evidence as to what accommodation was in fact requested, because my reading of the letters leaves me baffled as to what the accommodation was that was requested. [I][c]an't tell whether it was a request for more time while we were waiting for her to get psychiatric help and for her to get someone from the government to clean the apartment, or whether it was just a request to let her stay there and have the place continue in its current state. I just can't—I don't understand what the accommodation was.

The following day, in ruling that counsel for the tenant would not be permitted to

---

24. I find this to be a remarkable use of the word "only."

25. If the District was really going to clean the unit, it could have done so months earlier, when Adult Protective Services started to work with her. If, as counsel for the tenant proffered, the District failed to act earlier because the suit was pending, its position strikes me as unreasonable. Moreover, the District did nothing to help before the action for possession was brought. In any event, the District's delay in addressing this serious problem was not the fault of the landlord, and the landlord (and Ms. Douglas' fellow-tenants) should not be penalized on account of it.

present a Fair Housing Act defense before the jury, the judge elaborated:

> The only argument that the defendant can make, in light of this time line, is that her request for an accommodation implicitly sought an agreement by the plaintiff either to stay or to defer the lawsuit while the defendant received certain vaguely specified assistance from the District of Columbia [g]overnment. In my view, this request to the extent that it was made or even implied, was extremely vague.

The judge then concluded, for reasons described below, that if what was being requested was an accommodation at all, it was not a reasonable one. I agree with the judge.[26]

## C. The reasonableness of the accommodation.

### (1) The severity and duration of the conditions requiring correction.

As the foregoing discussion reflects, the "accommodation" demanded by Ms. Douglas' attorney—if it can be termed an "accommodation"—was to permit Ms. Douglas to continue to occupy her apartment in the hope that the District would help her to clean it and would also address Ms. Douglas' mental or emotional problems. The majority treats this as a modest and reasonable request:

> [T]he tenant was seeking, as a "reasonable accommodation," a stay of eviction for a period long enough for the District government to clean the premises and thus cure the tenant's breach of the lease. Significantly, moreover, counsel for the tenant was unequivocal in conceding that if the requested delay, coupled with government intervention, "didn't work out"—meaning that if the apartment became filthy again either because the tenant (after counseling) failed to change her ways, or because the government failed to continue its cleaning services on the tenant's behalf—the landlord would have an acknowledged remedy, eviction.

*Ante* at p. 955. If, however, the proposal of the tenant's attorney is placed in its proper context—if, for example, one considers the duration and severity of the lease violation, and the hypothetical and improbable character of the proposed remedy—the accommodation requested is anything but reasonable.

Although the majority apparently regards the point as more or less inconse-

---

**26.** According to the majority, the trial judge initially recognized that the government's willingness to clean the apartment and to keep the premises clean would resolve the landlord's concerns, but later ruled to the contrary. That is not what happened.

At the end of the June 17 hearing, the judge attempted to assist the parties to settle the case without the need for trial. Noting that the landlord was "sorry for the defendant," "not out for blood," and not "anxious to see this poor woman out on the street homeless," *ante* at p. 955–56, the judge suggested that a possible settlement might be predicated on the District government's taking immediate effective action to clean the unit and keep it clean. At the same time, the judge expressed concern regarding whether Ms. Douglas "would allow these folks in to clean her apartment." *Ante* at p. 956. All of the judge's remarks were made in the context of a possible settlement. The judge did not purport to make a legal ruling. Under the circumstances, I would not include in the appellate calculus the substance of settlement proposals discussed by the court and counsel.

In any event, as the tenant's attorney pointed out, this case could not be settled, for Ms. Douglas was not available to approve any hypothetical settlement. Without assurance of the tenant's cooperation, no resolution along the lines suggested would be reasonable. The judge ultimately ruled on the legal issues, which were not affected at all by judge's remarks during an unsuccessful exploration of the possibility of a negotiated resolution of the case.

quential, the fact is that, even as late as the trial date, Ms. Douglas' attorney was unable to answer the judge's question regarding the length of the delay that his client was requesting. By that time, Ms. Douglas had already resided in the apartment for almost a year and a half. Eleven months had elapsed since Ms. Reid discovered the unsanitary conditions in the unit. Almost eight months had passed since the expiration of the notice to cure or quit.

The reader will also recall that this case involves no minor lease violation. The odor in and emanating from the apartment was unbearable. The unit was filthy. Urine bottles, liquor bottles, spoiled food, trash and dirty clothes were strewn all over the floor. Piled up newspapers represented a fire hazard. The sink was filled with garbage. The conditions attracted rodents and vermin. Ms. Douglas was not in compliance with, *inter alia*, the requirement in the regulations that her unit be "as clean and sanitary as the conditions of the premises permit," and was therefore violating the District of Columbia regulations. 14 DCMR § 802.2(a).

Moreover, the evidence is uncontradicted that these conditions continued substantially unchanged from the day that they were discovered until the trial. Ms. Reid visited the apartment for the third time on April 12, 2002, to take more photographs. On this occasion the odor was even more powerful than before, and it reached all the way up the flight of stairs to the next level. Ms. Reid further testified:

Q. ... Since you first observed Ms. Douglas' apartment, has there been an occasion, to your knowledge, when her apartment was clean?

A. No, not at any time.

Thus, by the time the trial judge concluded that the proposed "accommodation" was not "reasonable," the landlord, and inferably the other tenants (as well as Ms. Douglas herself) had endured what must surely have been a nightmare—disagreeable, unlawful, and even dangerous conditions—probably for a year and a half, and certainly for almost a year. This is not a case in which the "accommodation" was being proposed a week after the problem began. Litigation, even theoretically "summary" proceedings in the Landlord and Tenant Branch, take time. The unsanitary state of Ms. Douglas' unit was of long standing, and its continuation constituted an obvious threat of harm to person and property. To ignore its severity and duration is to disregard reality. The need to put an immediate end to the intolerable and unlawful *status quo* was surely compelling and, for reasons that I have explained, see pp. 972–73, *supra,* no immediate end was in sight.

(2) *The proposed "accommodation."*

Having identified the scope of the problem in light of the existing reality, I now turn to the resolution proposed by the tenant's attorney. The first thing to be said about counsel's proposal is that the judge had nothing before him from the District to confirm that any cleaning would be done, or to apprise the court how frequently it would occur.[27] The following footnote in Kriegsfeld's legal memorandum to the trial court is "right on the money":

> Prior to receiving Defendant's Motion for Summary Judgment on Monday, June 10, 2002, the Plaintiff had never received a copy of the "Request for Reasonable Accommodation" which the Defense filed with Director of the D.C.

---

**27.** The majority insists, *ante* at p. 969, that the proffer from Ms. Douglas' attorney was all that was required. The proffer was second-

hand, however, and was virtually devoid of any substantive content.

Department of Consumer and Regulatory Affairs, and was not aware of the content of that document. Upon reviewing the document, it is apparent that the centerpiece of the request is the assertion that the "District of Columbia Government is prepared to assist her with cleaning her apartment." Since Defense Counsel is not authorized to speak for the D.C. Government, his promises on their [sic] behalf carry no weight, and are wholly unenforceable. That the D.C. Government was apparently inclined to help the Defendant clean her apartment and has failed to do so since at least February (the date of the request) does not bode well for their [sic] resolve to do so.

According to the majority, the cleaning of the apartment was to be accomplished by the District's Office of Adult Protective Services. Damon Byrd, the representative of that agency who was assigned to Ms. Douglas' case, testified on behalf of the tenant at the June 17 pretrial hearing. Byrd told the court that he had met with Ms. Douglas no fewer than sixteen times since his first encounter with her in July 2001. During the eleven months that followed, the agency evidently made no effort to clean the apartment, either before or after Kriegsfeld brought its action for possession; obviously it was not merely the pendency of the lawsuit that had prevented the unit from being cleaned. Byrd was not asked what, if any, measures Adult Protective Services proposed to take to bring the apartment into compliance with the law, and his testimony did not address the point. If the problem of inducing the District to clean the apartment and keep it clean was as straightforward as the majority now suggests, then surely counsel for the tenant would have elicited such testimony (or an affidavit) from Mr. Byrd. The District's silence, which compelled counsel for Ms. Douglas to rely on a vague secondhand proffer devoid of any reassuring detail, speaks volumes and illustrates the flimsiness of the tenant's position. "The production of weak evidence[28] when strong is available can lead only to the conclusion that the strong would have been adverse." *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 226, 59 S.Ct. 467, 83 L.Ed. 610 (1939).

Further, the reliability of the District's purported offer to help to clean the apartment *only* if the landlord's action for possession was terminated—not the most humane "only if" under any circumstances— is undermined by the District's failure to provide any such assistance during the four months from July 2001, when Byrd first learned of the situation, to November 2001, when the suit was brought. At the time that the judge made his decision, the prospect that the long-festering conditions in Ms. Douglas' apartment would be immediately or even promptly corrected was, to put it mildly, less than encouraging. Moreover, the proposed resolution would obviously require the full cooperation of the tenant, and the tenant was nowhere to be found. The majority's blithe assurance that this does not matter because it was the responsibility of counsel for the tenant to obtain the "understanding, acceptance and support" of a tenant whom counsel had long been unable to contact, *ante* at p. 969, does not strike me as the apogee of realism.

In assessing the situation before him, the judge was not required to, and he did not, leave his common sense behind. We should not reverse a decision which was demonstrably based on a practical and realistic appraisal of the evidence before him.

---

**28.** Or, in my view, of a weak proffer.

*(3) The legal standard.*

The question whether an accommodation is reasonable "is highly fact-specific, and determined on a case-by-case basis by balancing the cost to the defendant [and here, to third parties and to the public] and the benefit to the plaintiff." *Dadian v. Vill. of Wilmette*, 269 F.3d 831, 838 (7th Cir.2001) (citing *Bronk*, 54 F.3d at 429); *Advocacy Ctr. for Persons with Disabilities, Inc. v. Woodlands Estates Ass'n, Inc.*, 192 F.Supp.2d 1344, 1348 (M.D.Fla.2002). An accommodation is unreasonable, *inter alia*, if it "impose[s] undue financial and administrative burdens" on the housing provider. *Bryant Woods Inn, Inc. v. Howard County*, 124 F.3d 597, 605 (4th Cir.1997) (citation and internal quotation marks omitted); *Advocacy Ctr.*, 192 F.Supp.2d at 1348. In determining reasonableness, "[t]he overall focus should be on 'whether waiver of the rule [29] ... would be so at odds with the purposes behind the rule that it would be a fundamental and unreasonable change.'" *Dadian*, 269 F.3d at 838–39 (quoting *Washington v. Indiana High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 850 (7th Cir. 1999)). In this case, it would surely be an intolerable burden on the landlord (and on the other tenants) to require Kriegsfeld to leave uncorrected, for an additional period of unpredictable duration, the unsanitary conditions that had existed for so long in Ms. Douglas' apartment. *Cf. Groner v. Golden Gate Apts.*, 250 F.3d 1039, 1045–47 (6th Cir.2001) (holding that a landlord was not required to renew the lease of a schizophrenic tenant whose behavior generated frequent complaints from neighbors; the

court concluded that the requested accommodation was not reasonable). Moreover, further exposure to the odor, filth, vermin infestation, and danger of fire (all associated with Ms. Douglas' unit) would surely constitute a fundamental and unreasonable change from the landlord's rule as expressed in the lease (and in District of Columbia regulations) that tenants must maintain sanitary conditions in their units. A resolution that prolongs a protracted unlawful condition cannot be a "reasonable accommodation" under the Act, and the majority unsurprisingly has cited no authority for the proposition that "unlawful" is consistent with "reasonable." Surely, an unlawful "reasonable accommodation" is an oxymoron.

*(4) The landlord's alleged refusal to open a "constructive dialogue."*

Ms. Douglas' attorney claims, and the majority evidently agrees, that the landlord discriminated against Ms. Douglas by failing or refusing to "open a dialogue" with the tenant to determine if a reasonable accommodation was feasible. *See Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 895 (7th Cir.1996). According to the majority, the landlord failed to respond to the February 20, 2002 letter from tenant's counsel and thus refused to negotiate. Remarkably in light of the record, the majority accuses the trial judge of "ignor[ing] the fact that between February 20 and early June 2002—a period longer than three months—the landlord's counsel refused to respond to the tenant's counsel." *Ante* at p. 959.

---

**29.** The quoted reference to "waiver of the rule" confirms my view that the relief sought by counsel for the tenant in this case does not fit the fundamental conception of an accommodation within the meaning of the FHAA, for here no such "waiver" of a "rule" was being sought. Rather, counsel for Ms. Douglas simply requested that his client be permit-

ted to remain on the premises pending vaguely described future actions by the District of Columbia government.

My colleagues assert, *ante* at p. 970 that the discussion in this footnote is at odds with another part of my opinion. This supposed inconsistency eludes me.

Preliminarily, the judge did not ignore anything. In the trial court, the tenant's counsel never claimed that the landlord had violated the Act by failing to negotiate or respond. In his legal memorandum to the trial court filed on May 31, 2002, Ms. Douglas' attorney did not say a word on the subject.[30] On appeal, counsel for the tenant made no explicit allusion to the February 20 letter and no argument based on its existence. In other words, the appellant has not made this claim at all, but my colleagues are making it for her. Under these circumstances, the majority's conclusion that the trial judge erred by "ignoring" something that was not mentioned to him or to us seems to me to run afoul of the most fundamental principles of appellate practice, namely, that the court should confine itself to the contentions of the parties (rather than addressing issues that the parties did not raise), see, e.g., Rose v. United States, 629 A.2d 526, 529–30 (D.C.1993), and that, absent extraordinary circumstances, we should not reverse a judgment for reasons never advanced by the appellant. Miller, 127 U.S.App. D.C. at 369–70, 384 F.2d at 321–22.

Moreover, the February 2002 letter that Ms. Douglas' attorney wrote to the DCRA and to the landlord's counsel was, to put it mildly, less than precise. The "proposal," if it can be so characterized, was that Ms. Douglas be permitted to stay in her unit and that, at some unspecified future date, the District would not only clean the apartment but also address the tenant's claimed psychiatric problems. In the tenant's part of the Joint Pretrial Statement filed on April 11, 2002, counsel for the tenant was even less specific than in the February letters with respect to what he wanted the landlord to do or when the District would carry out the promises that it was supposed to have made. As a practical matter, there was no concrete proposed accommodation on the table, and the landlord could not reasonably be expected to negotiate on the basis of a proposal which lacked any meaningful content except for a demand that a tenant who was in noncompliance with her lease and with the law be permitted to stay on for an unknown but potentially extensive period of time.

A week before the trial, according to the tenant's attorney, Kriegsfeld's new counsel made "overtures" regarding possible settlement. These overtures came to naught, however, because the tenant's counsel could not locate his client to present any proposed settlement offer to her. The landlord's offer was neither accepted nor rejected, and no counter-offer was forthcoming, for Ms. Douglas, having apparently elected to have nothing to do with the lawsuit, declined to make herself available to her lawyer to discuss any offer of settlement. The majority thus puts the blame on the landlord, who attempted to negotiate, and identifies the wronged party as the tenant, who refused to do so.

But even if the landlord had declined to engage in a "constructive dialogue," the majority's position would still be in error. Kriegsfeld and its attorney could reasonably believe that Ms. Douglas was not suffering from a handicap within the meaning of the Act,[31] that the unsanitary

---

30. The majority states, ante at p. 954, that the February 20 letter is "discussed" in the tenant's June 10, 2002 memorandum in support of her motion for summary judgment. It is true that the contents of the letter are summarized in that memorandum, but there is not the slightest suggestion in that submission, or in any filing by counsel for the tenant in either court, of a claim that Kriegsfeld violated the Act by not responding to the letter.

31. The majority's insistence that the landlord could not reasonably believe this, when the judge subsequently ruled that the landlord's

and unlawful conditions that she had caused could not be ameliorated without evicting her, and that Kriegsfeld, as landlord, was entitled to judgment of possession. It is illogical to argue that the landlord was required to offer Ms. Douglas a reasonable accommodation before it was established that she was a handicapped person entitled to an accommodation—a contested issue on which the trial judge ultimately ruled for Kriegsfeld.[32] Especially on a record such as the one before us, I do not believe that the FHAA, reasonably construed, required the landlord to negotiate for, or accept, any settlement short of a favorable judgment. Ms. Douglas had already done enough harm to the landlord's property and to her fellow-tenants. At least in the absence of a finding that Ms. Douglas had a mental impairment which prevented her from complying with her lease and with the law, Kriegsfeld had no obligation to endure still more harm, or to continue to expose its tenants to such

intolerable and unlawful conditions in the building in which they lived.

(5) *The landlord's right to judicial redress.*

Remarkably, the majority also appears to assert that once Kriegsfeld had been apprised by counsel for the tenant of Ms. Douglas' claim of mental impairment, the "pursuit of a pending action for possession [was] a discriminatory act under the Fair Housing Act and the D.C. regulations that implement it." *Ante* at p. 961.[33] I emphasize again that no impartial tribunal had found that Ms. Douglas was in fact handicapped in any relevant way. Indeed, prior to today, no such finding has ever been made. In the view of the trial judge—the sole impartial participant in the Superior Court proceedings—Ms. Douglas did not show either that she was mentally impaired in any relevant way or that, as a result of any impairment, she was unable

---

belief was legally correct, gives a whole new meaning to the word "reasonable." I suggest, contrary to the majority, that although a belief may be reasonable even if the believer is subsequently shown to be wrong, that belief surely cannot be *un*reasonable when an impartial trial judge rules that it is right! Moreover, the fact that Kriegsfeld's manager suggested to Ms. Douglas that she see a psychiatrist is hardly expert evidence that Ms. Douglas was suffering from an illness which made it impossible for her to keep her unit clean.

32. The majority concedes, *ante* at pp. 968–69, that, assuming good faith (which cannot fairly be challenged here), the landlord had no obligation to yield to a request for an accommodation before the judge ruled. Nevertheless, my colleagues argue that if the landlord does not "open a dialogue" with the tenant even before a ruling, it "must assume responsibility for the time that elapsed between the tenant's request for accommodation and the court's eventual ruling." The logic of this proposition eludes me. As my colleagues implicitly admit, or at least do not deny, there was no duty to "open a dialogue" unless the tenant

has first been shown to be suffering from a relevant handicap. If, as all agree, there was no pre-ruling duty to initiate any dialogue, the landlord cannot be faulted for (allegedly) not starting one.

The majority asserts that the landlord should have known that Ms. Douglas was suffering from a handicap because Ms. Reid suggested that Ms. Douglas seek psychiatric assistance. Ms. Reid, a layperson, could not possibly have known whether Ms. Douglas was suffering from the type of affliction that would warrant excusing her from her obligations under the lease and the law.

33. The court thus adopts the remarkable view urged upon it by counsel for the tenant:

> THE COURT: ... What is discrimination? Is it maintaining the lawsuit?
> [COUNSEL FOR MS. DOUGLAS]: I would think so.

I leave it to the reader to determine whether counsel for the tenant did or did not claim that the pursuit of eviction, even absent a ruling on whether the tenant was handicapped, violated the Fair Housing Act. Compare maj. op., *ante* at p. 961.

to comply with the lease. Any duty to offer a reasonable accommodation can arise only if the tenant is in fact suffering from the requisite handicap; there is no obligation to accommodate a non-handicapped person, however eccentric she may be, if she violates her lease and the law.[34] Nevertheless, say my colleagues, the landlord was required to discontinue the litigation for some unspecified period even if, in the landlord's view, the tenant's proffered Fair Housing Act defense was without merit, and even if continued toleration of the conditions in the tenant's apartment represented a threat to the person and property of others. In my opinion, this position is untenable.

In ruling for the landlord with respect to the Fair Housing Act defense, the trial judge stated:

I'm not prepared to adopt the position that the plaintiff discriminated against the defendant by maintaining a lawsuit that it was authorized to bring both by the housing laws of the District of Columbia and by its contractual agreement with the defendant because by necessity I would have to—in order to allow this defense, I would have to conclude that it was the mere maintenance of this lawsuit by the plaintiff that was itself the discriminatory act, and I don't know of any case law or statutory interpretation or legislative history or statutory language, for that matter, that would support such a proposition.

There is ample authority supporting the trial judge's position. What counsel for the tenant was requesting, after all, was that Kriegsfeld desist—possibly for a long time—from asking the court to rule on the dispute between the parties. Moreover, according to Ms. Douglas' attorney and, now, according to this court, the continued pursuit of the action was a violation of the Fair Housing Act. The majority seems to believe that whether or not Kriegsfeld was in the right on the merits of the existence or non-existence of a handicap, the Act prohibited the landlord from seeking a ruling that would vindicate the landlord's potentially legitimate position. See *ante* pp. 960–61.

Almost a century ago, the Supreme Court proclaimed that

[t]he right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government. It is one of the highest and most essential privileges of citizenship. . . .

*Chambers v. Baltimore & Ohio R.R. Co.,* 207 U.S. 142, 148, 28 S.Ct. 34, 52 L.Ed. 143 (1907). The right of access to the courts is but one aspect of the broader right, protected by the First Amendment, to petition the government for redress of grievances. *See California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Indeed, the right to petition is "among the most precious of the liberties safeguarded by the Bill of Rights," *United Mine Workers v. Illinois Bar Ass'n,* 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967), and it is "intimately connected, both in origin and in purpose, with the other First Amendment rights of free speech and free press." *Id.* " 'Meaningful access to the courts is a fundamental right of citizenship in this country.' " *Martin v. Lauer,* 222 U.S.App.

---

**34.** In this respect, the case differs materially from one involving, say, a blind person or a paraplegic, whose affliction is obvious and indisputable. Whether Ms. Douglas' alleged mood disorder constituted a handicap within the meaning of the Act was an open question when, according to my colleagues, the landlord violated that statute by pressing its suit to judgment. If, as the judge concluded, Ms. Douglas was not handicapped, then the landlord was not required to offer her an accommodation.

D.C. 302, 310, 686 F.2d 24, 32 (1982) (quoting *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir.1979)). Put another way, a citizen has a "basic right ... to seek redress in court for what he considers to be a wrong." *Spencer v. Burglass*, 337 So.2d 596, 601 (La.Ct.App.), *cert. denied*, 340 So.2d 990 (La.1977).

I do not doubt that, upon an adequate ground, a judge has the authority to order a stay in a lawsuit, although I perceive no grounds for a stay in this case. But what we have here is not a dispute over whether sufficient evidence has been presented to support an application for a discretionary stay. On the contrary, counsel for the tenant asserts, and the court seems to agree, that once a claim of mental impairment had been made, the FHAA prohibited the landlord from continuing to seek judicial redress for what the landlord reasonably regarded as an obvious and flagrant wrong. " 'The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms.' " *California Motor Transp.*, 404 U.S. at 510, 92 S.Ct. 609 (quoting *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961)). The Fair Housing Act contains no provision making it a discriminatory housing practice to seek an adjudication of one's grievance in an appropriate judicial forum, and the court should not ascribe to Congress an intention to restrict the right to seek judicial redress. This is especially true where, as here, no impartial body had found that Ms. Douglas was entitled to any kind of accommodation.

## D. *The timeliness of the request.*

In light of my view (and the trial judge's) that the "accommodation" requested on behalf of Ms. Douglas, if it was an accommodation at all, was not a reasonable one, and that, as a matter of law, there has been no violation of the FHAA, the question of timeliness becomes less significant. A brief discussion is in order, however, for the majority's position, if followed to its logical conclusion, leads to mischievous results.

First, timeliness, like reasonableness (to which timeliness is closely related), must be assessed on a case-by-case basis. In their discussion of the question whether the request for "accommodation" was timely, my colleagues all but ignore the length of time that the offending condition has existed, *i.e.*, the duration of the violation of the lease and of the regulations, except that they unjustifiably blame four months of it on the landlord.[35] They likewise attach little significance either to the date on which the tenant was apprised that she must cure the violation or quit the apartment, or to the tenant's delay in fleshing out the desired accommodation. But surely these factors must be prominently included in the "reasonableness" calculus. The longer the landlord and the other tenants have been exposed to the unsanitary conditions in Ms. Douglas' unit, and the more time that has passed since the notice to quit or cure was served on Ms. Douglas, the more promptly any proposal for an accommodation must be made and carried out. Eighteen months of a very serious violation should not be treated in

---

**35.** It is true, as the majority points out, that much of the elapsed time "was attributable to the normal requirements of the judicial process," *ante* at p. 968, though one wonders why the landlord failed to seek emergency relief to protect itself and its other tenants from the unsanitary and unlawful conditions created by Ms. Douglas. But nothing was preventing the tenant (or the District) from cleaning the apartment in the interim. Further, the fact that the situation had, for whatever reason, existed for so long cuts strongly in favor of, not against, an immediate remedy.

the same way as eighteen hours of a like transgression.

In *Grubb v. Wm. Calomiris Investment Corp.*, 588 A.2d 1144, 1147 (D.C.1991) (per curiam), this court recognized that it is within the trial court's discretion to grant possession to the landlord where there has been a lease violation, even if that violation has been belatedly cured after the expiration of the notice to cure or quit. The trial judge relied, in part, on *Grubb* in concluding that the request for accommodation, if that is what it was, was untimely. The majority says that *Grubb* should not apply where a Fair Housing Act defense is asserted, but I discern nothing in the Act that bears on the issue. The majority also notes the court's acknowledgment in *Grubb* that a "relevant factor in determining whether forfeiture [of a lease] should be ordered is the presence or absence of 'fair dealing' by the landlord," and faults the trial judge for not considering this factor. As I have demonstrated, however, there has been no "absence of fair dealing" on the part of the landlord in this case, and the majority's criticism of the trial judge therefore falls wide of the mark.

In my opinion, the holding in *Grubb* (that the trial court does not abuse its discretion by rejecting a belated cure of a lease violation) should apply to "reasonable accommodation" requests just as it does to other defenses. Cases involving requests for accommodation differ widely from each other, and an inflexible rule of any kind would not serve the interests of justice. Ordinarily, the tenant should apprise the landlord of his or her handicap, and make any request for accommodation, before the notice to quit or cure expires. At the same time, I agree that the trial judge should have authority to accept a later request for accommodation if to do so would be equitable under the circumstances. In this case, given the prolonged and extreme violations, as well as Ms.

Douglas' unavailability, it would be less than equitable to entertain so late a request, and the trial judge did not abuse his discretion in so ruling.

Relying on *Radecki v. Joura*, 114 F.3d 115, 116 (8th Cir.1997), my colleagues assert that, for purposes of determining the timeliness of a request for an accommodation, a denial of a dwelling, within the meaning of 42 U.S.C. § 3604(f)(1)(A), is "deemed to occur during the entire period before a tenant is 'actually evicted.'" *Ante* at p. 959. If this statement is taken literally, then the tenant would presumably have the right, *even after judgment of possession is entered*, to claim for the first time that she suffers from a handicap and to demand a "reasonable accommodation." Indeed, according to the Legal Aid Society, which filed a brief *amicus curiae* in support of counsel for the tenant, "[t]he Fair Housing Act requires that a landlord attempt to accommodate a tenant's disability once the tenant has requested a reasonable accommodation *at any time before an eviction*." (Emphasis added.) I do not believe that the majority favors such an extreme result, which would permit the landlord to be effectively ambushed after justifiably and successfully resorting to the judicial process to vindicate his rights. I am gratified that my colleagues do not countenance a tenant's tactic of keeping a "handicap" defense in his or her vest pocket and producing it, with or without a flourish, a day (or an hour) before the scheduled eviction. I mention the problem only because the use of the phrase "at any time before an eviction" could lead to a slippery slope down which, I hope and trust, the majority would prefer not to descend.

E. *Threat to health or safety.*

The FHAA contains the following provision:

> Nothing in this subchapter requires that a dwelling be made available to an indi-

vidual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damages to the property of others.

42 U.S.C. § 3604(f)(9). I think it obvious that the condition of Ms. Douglas' apartment potentially threatened the health and safety of the other tenants and resulted in damage to the landlord's property. The trial judge stated that "[w]hen you're talking about a situation [such] as the one here, where the condition of the apartment appears so clearly to pose a direct threat to the health and safety of others, [it] seems to me that a delay, or a requested accommodation that is simply a delay, would not be one that the landlord would have to provide." I agree.

There is case law to the effect that the "threat to the health or safety of others" provision comes into play only *after* a reasonable accommodation has been attempted or a showing that no reasonable accommodation will eliminate or acceptably minimize any risk to others. *See, e.g., Roe v. Hous. Auth. of Boulder,* 909 F.Supp. 814, 822–23 (D.Colo.1995). But this proposition cannot be true "across the board." The determination must surely depend on several factors, including the severity and duration of the danger and the anticipated amount of time required to explore and implement the requested accommodation. Obviously, if the danger to person and property is imminent, indefinite delay cannot be tolerated. In the present case, the smell, the threat of rodents and vermin, the fire hazard, and the other severe problems in Ms. Douglas' apartment were sufficient, in my view, to warrant the court's refusal to countenance their continuation for another minute, and especially for a period of time that even

counsel for Ms. Douglas was not prepared to estimate. I am therefore satisfied that there was no error in the trial judge's analysis of this provision of the statute.

## III.

## CONCLUSION

For the foregoing reasons, I would affirm the judgment of the trial court. In my opinion, the trial judge analyzed the case thoughtfully, impartially, and in accordance with precedent and common sense.[36] Because my colleagues view the issues differently, however, I must respectfully—but emphatically—dissent.

## APPENDIX A

NEIGHBORHOOD LAW OFFICE (SERVING NORTHWEST)

NEIGHBORHOOD LEGAL SERVICES PROGRAM

HEADQUARTERS 701-4th STREET, N.W. WASHINGTON, D.C. 20001 OFFICE OF THE DIRECTOR (202)682-2720 (202)682-0588[FAX] NEIGHBORHOOD LAW OFFICE [SERVING NORTHEAST] (202)682-2735 (202)682-0588[FAX]

701 FOURTH STREET, N.W. WASHINGTON, D.C. 20001 (202)682-2700 (202)682-0588[FAX]

NEIGHBORHOOD LAW OFFICE NEIGHBORHOOD LAW OFFICE NO. 5 [SERVING SOUTHEAST & SOUTHWEST] 1213 GOOD HOPE ROAD S.E. WASHINGTON, D.C. 20020 (202)678-2000 (202)8889-3374[FAX]

February 5, 2002

TO: Director

---

**36.** I should also add that a number of the judge's oral rulings read like first-rate and polished written opinions.

DC Department of Consumer and Regulatory

Affairs

941 North Capitol St., NE

Room 1120

Washington DC 20002

### REQUEST FOR REASONABLE ACCOMODATION

RE: Evelyn Douglas

1430 W Street NW

# B–1

Washington DC 20009

Dwelling Owner: Kreigsfeld Corporation

Requested Accommodation Location:

1430 W Street NW—# B–1

Washington DC 20009

*Description of the Accommodation: On behalf of Evelyn Douglas, we are hereby requesting a reasonable accommodation under the Federal Fair Housing Act.* The appropriate section of the DC Municipal Regulations is Chapter I Title 14 Section III. It appears in the DC Register—November 13, 1998.

Ms. Douglas would like to remain in her unit despite the recent suit for possession instituted by the owner. Ms. Douglas is being sued for failure to maintain her apartment in a safe and sanitary condition. Ms. Douglas denies all allegations relating to the conditions of the apartment. Ms. Douglas has expressed a desire to remain in her unit directly to property management. In addition, through counsel she has expressed an interest to landlord's counsel in remaining in her apartment. In fact, she is requesting that the housing provider terminate all efforts to obtain possession of her unit and provide a reasonable accommodation suitable to all parties.

*Reason for needing the accommodation:* Ms. Douglas, among other things, suffers from a disability (mental) as defined by the Fair Housing Act. She is currently diagnosed with a mood disorder. She is, therefore, eligible to request a reasonable accommodation. In addition, notwithstanding Ms. Douglas' denial of all allegations levied against her, if she is responsible for any violations of her lease, it is directly due to her mental disabilities.

Ms. Douglas is not asking for an unreasonable arrangement. Ms. Douglas is requesting a reasonable accommodation appropriate for an individual who is mentally challenged by a recognized mental disability. The District of Columbia government is prepared to assist her with cleaning the apartment. She has already been referred for psychiatric outpatient treatment through the District of Columbia government as well. She is prepared to continue any treatment that will improve her mental condition. Ms. Douglas also has other health problems that aggravate her mood disorder.

Reasonable accommodations have been granted for the reasons stated above in numerous cases.[1] In these cases, reasonable accommodation requests by individuals were upheld by the federal courts under very similar circumstances. "Federally subsidized housing complex can refuse to offer continued housing to handicapped tenant, pursuant to exemption under Fair Housing Amendments Act for tenants that represent threat to safety of others living at the complex, only if tenant in question is threat to safety of others after complex has made reasonable

---

**1.** *Roe v. Housing Authority of the City of Boulder,* 909 F.Supp. 814 (D.Colo.1995); *Roe v.* *Sugar River Mills Associates,* 820 F.Supp. 636 (D.N.H.1993).

efforts to accommodate tenant's handicap." Ms. Douglas is seeking such efforts from her housing provider at this time.

Ms. Douglas is only seeking the same equitable treatment and is requesting such an accommodation. Her housing provider would only need to delay taking any further action to obtain possession of her unit and to afford her an opportunity to work with the District of Columbia government in resolving her disability issues as they relate to her current housing arrangement.

Sincerely,

Brian Gilmore
Staff Attorney

## APPENDIX B

### NEIGHBORHOOD LAW OFFICE (SERVING NORTHWEST)

### NEIGHBORHOOD LEGAL SERVICES PROGRAM

HEADQUARTERS 701-4th STREET, N.W. WASHINGTON, D.C. 20001 OFFICE OF THE DIRECTOR (202)682-2720 (202)682-0588[FAX] NEIGHBORHOOD LAW OFFICE [SERVING NORTHEAST] (202)682-2735 (202)682-0588[FAX]

701 FOURTH STREET, N.W. WASHINGTON, D.C. 20001 (202)682-2700 (202)682-0588[FAX]

NEIGHBORHOOD LAW OFFICE NEIGHBORHOOD LAW OFFICE NO. 5 [SERVING SOUTHEAST & SOUTHWEST] 1213 GOOD HOPE ROAD S.E. WASHINGTON, D.C. 20020 (202)678-2000 (202)8889-3374[FAX]

February 20, 2002

Johnathan Schuman

4804 Moorland Avenue
Bethesda, MD 20814

*Kriefsfeld v. Douglas*—L & T 50733–01

Dear Mr. Schuman:

This letter is a follow-up in the Evelyn Douglas case that has just had its scheduling conference. Although it seemed initially that Ms. Douglas may vacate her unit, that was never her intention according to Ms. Douglas. She was led to believe that she had to vacate. In addition, despite the filing of this suit for possession of her apartment, Ms. Douglas denies the allegations contained in the complaint.

If you are not aware, Ms. Douglas suffers from a mood disorder (mental illness). She is on SSI disability. She has been assigned a case worker with the District of Columbia government and she is an outpatient at a city operated mental health/substance abuse clinic.

Ms. Douglas would like to remain in her unit. She has stated that to management previously. The District of Columbia government has advised me that they are prepared to assist her with her problems because it is their opinion as well that Ms. Douglas would benefit from intervention and a reasonable accommodation. As an individual suffering from a mental illness, Ms. Douglas is entitled to a "reasonable accommodation" in her housing arrangement under federal law. She has expressed a desire to remain in her unit. In fact, she has recently *requested a reasonable accommodation* under applicable District of Columbia procedure. She is reasserting that request here again.

Ms. Douglas would like to remain and seek treatment and counseling for her disabling conditions. She has no problem abiding by her lease and is only requesting a reasonable accommodation in complying with provisions of that lease. I am certain

you are familiar with the *Fair Housing Act* and the protections it affords to individuals suffering from disabling conditions in housing situations. It is our contention that Ms. Douglas should be afforded such protections under the act in this case.

We would like to bring closure to the suit in order to allow Ms. Douglas a reasonable accommodation in her housing arrangement. With the assistance of the DC government, it is my belief that this is a reasonable request. If you would like to discuss this matter further, please do not hesitate to contact me.

Sincerely,

Brian Gilmore
Staff Attorney